**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al. v. UNITED STATES (two cases).**

**Nos. 9943, 9944.**

United States Court of Appeals
District of Columbia Circuit.

Argued March 21, 1949.

Decided June 6, 1949.

Writ of Certiorari Denied Nov. 7, 1949.
See 70 S.Ct. 140.

Messrs. Welly K. Hopkins, Washington, D. C., and M. E. Boiarsky, Charleston, W.

Va., with whom Messrs. Harrison Combs, Washington, D. C., and T. C. Townsend, Charleston, W. Va., were on the brief, for appellants.

Mr. Joseph M. Friedman, Special Assistant to the Attorney General, with whom Mr. H. G. Morison, Assistant Attorney General, and Messrs. Samuel K. Abrams, Roscoe L. Barrow and Jess H. Rosenberg, Attorneys, Department of Justice, Washington, D. C., were on the brief, for appellee.

Mr. Thomas E. Harris, Washington, D. C., filed a brief on behalf of the Congress of Industrial Organizations as amicus curiae, urging reversal.

Messrs. J. Albert Woll, Herbert S. Thatcher and James A. Glenn, Washington, D. C., filed a brief on behalf of the American Federation of Labor as amicus curiae, urging reversal.

Messrs. Henry Kaiser and Gerhard P. Van Arkel, Washington, D. C., filed a brief on behalf of the International Typographical Union as amicus curiae, urging reversal.

Before WILBUR K. MILLER, PRETTYMAN and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

These are appeals from judgments of the District Court of the United States for the District of Columbia. One (No. 9943) is in a proceeding in which appellants were found guilty of criminal contempt and sentenced to pay fines for the offenses. The other (No. 9944) is from orders granting a temporary restraining order, denying a motion to dissolve that order, and granting a preliminary injunction.

The chronology of events is important. All occurred in 1947 and 1948.

On July 7, 1947, the defendant Union and numerous coal operators made an agreement, continuing, amending and supplementing prior agreements concerning wages, working conditions, etc. Among other things, a welfare and retirement fund was created, to be composed of payments made by the operators and to be operated by a board of three trustees, one representative of the employers,[1] one of the Union, and the third a neutral party selected by the other two. The operators appointed Ezra Van Horn, and the Union appointed John L. Lewis. The contract provided that the trustees should designate a portion of the payments as a separate fund to be used for pensions or annuities for members of the Union and their families and dependents. On July 8th Lewis and Van Horn selected Thomas E. Murray the third trustee. The trustees could not agree upon the operation of the pension fund.

On January 16, 1948, Murray resigned as trustee. The other two trustees could not agree.

On January 20th Lewis wrote two representatives of the operators that a dispute concerning the pension fund had arisen and remained unsolved, and he called upon them to settle the dispute by collective bargaining. He suggested a meeting with these addressees.

On January 24th one of the addressees of the Lewis letter replied that he represented only a small number of the operators, that the contract prescribed the machinery for selecting a third trustee, and that the operation of the welfare fund was lodged in the trustees. He further suggested that pursuant to the contract a conference of all signatories thereto be called in order to get the fund into operation.

On January 28th the other addressee wrote Lewis that he had no authority to speak for any other signatory and that "the law" provided the method for settling disputes between the two trustees.

On January 30th Lewis wrote the same two addressees that the Union dissented from the views expressed in their letters, that the dispute continued unresolved, and that "Accordingly the United Mine Workers of America reserve the right at will to take any independent action necessary to the enforcement of the contract."

On February 2d Lewis sent a notice to all signatories to the contract, stating that Van Horn continued "to thwart the fulfillment of that contractual obligation" and

---

[1] The agreement used the terms Operators and Employers interchangeably.

that "It now constitutes an outstanding, unresolved dispute, national in scope and character, affecting the integrity of the contract and impeding its fulfillment." He advised them as to the reservation of right by the Union, using the same language he had used January 30th.

On March 12th Lewis wrote to the officers and members of all local unions in the bituminous districts, describing in vigorous terms the dispute and saying that the operators had dishonored the contract and defaulted under its provisions. The latter half of the letter read:

"Your representative Trustee, and all other representatives of the United Mine Workers of America, during this eight months' period have worked constantly and diligently to resolve with the Coal Operators and with the Trustees the several questions involved. These efforts have been without avail. The Coal Operators and their Trustee continue gleefully to violate the contract, and count each day a success when they can prevent expenditure of this money designed to alleviate the human misery in the coal industry. The destitution of the aged, the extremity of the sick and injured and the poverty of orphans and widows are things which concern them not. Nineteen forty-seven was the most financially profitable year in the history of the coal industry, and yet the millionaire coal operators of this country, with the aid of Robert Taft and his Slave Statute, are successfully preventing the distribution of this ten cents a ton Fund, which is designed only to abate human misery.

"During the past year and throughout the hard winter which has afflicted the nation, our membership have continued loyally and with a sense of public duty to break all records in the production of coal. This service increased the profits of the coal companies and should have won their respect for contract and some consideration for human values; but instead has made them contemptuous of their contractual and moral obligations.

"The winter is now gone. This office proposes to go forward in requiring the coal operators to honor their agreement. Your ears will soon be assailed by their outcries and wails of anguish. To relieve themselves, they need only to comply with the provisions of the Agreement which they solemnly executed in this office on July 8, 1947.

"Please discuss this matter in your local unions so that our membership may be fully advised. You will later hear more from this office on this subject."

From March 11th to March 20th, the net tons of bituminous coal produced, by days, were, according to the Bureau of Mines:

| | |
|---|---|
| March 11th | 2,226,000 tons |
| March 12th | 2,110,000 tons |
| March 13th | 1,755,000 tons |
| March 15th | 1,774,000 tons |
| March 16th | 763,000 tons |
| March 17th | 554,000 tons |
| March 18th | 520,000 tons |
| March 19th | 405,000 tons |
| March 20th | 344,000 tons |

The Bureau of Mines statistics showed that the following numbers of miners stopped work on each of the days indicated:

| | |
|---|---|
| March 13th, Saturday | 17,434 |
| March 15th, Monday | 103,946 |
| March 16th, Tuesday | 81,659 |
| March 17th, Wednesday | 19,203 |
| March 18th, Thursday | 2,129 |
| Total stoppage for five days employees. | 224,371 |

On March 23d the President of the United States, acting under authority of the Labor Management Relations Act of 1947,[2] by Executive Order 9939 created a Board of Inquiry.

On March 31st the Board of Inquiry, having held public hearings, reported. It described the dispute concerning the welfare fund, related the events above outlined, told of the stoppage of work, and concluded: "We find independent action was taken by the President of the United Mine Workers of America in the form of communications to the Officers and Members of the United Mine Workers of America which

2 Sec. 206, 61 Stat. 155, 29 U.S.C.A. § 176.

induced them to take concerted action to stop work in all the mines of the operators signatory to the Agreement of July 8, 1947. We find the stoppage was not independent action by miners acting individually and separately. Their stoppage has precipitated a crisis in the industry and in the nation as a whole."

On April 3d (a Saturday), Lewis wrote to the officers and members of all local unions. He described in chronological order the events from March 12th. He then said:

"Subsequent to my circular to you of March 12, the Press, many officials in government and the coal operators, individually and collectively, have repeatedly charged that I, by the message of March 12, authorized or directed or suggested or indirectly requested or recommended a stoppage of work, or as some have called it 'a strike' in protest to the dishonoring of the contract (as we saw it) by the coal operators.

"It is well known to you that I have not in connection with the present dispute, either by the circular of March 12, or by any other circular or document, or at any other time authorized, directed, suggested, requested or recommended any stoppage of work or any continuation of any stoppage and I do not now do so.

"Your actions in this regard in the original instance were your own, individually determined by you. I asked you on March 12 'to discuss the matter in your local union so that our membership may be fully advised.' Such discussions as may have been held, or which you may hereafter desire, have been and will continue to be, on your own initiative. As far as I know it is still the inherent right and privilege of American citizens to continue to exercise the right of free speech and freedom of assembly.

"Any action or decision which you may now care to take continues to be entirely for your own determination without direction of any character from me or from any of your International Officers.

"I, therefore, now repeat that you are not now under, and have never been under, any orders, directions or suggestions, expressed or implied from me, or any of the Union officers, to cease work or to continue to cease work in protest to the present dishonoring (as we see it) of the 1947 contract. I now report factually the events which have occurred and the situation as it presently exists."

On the same day, April 3d, the President wrote the Attorney General, enclosing a copy of the report of the Board of Inquiry and saying: "As I stated in my Executive Order of March 23, 1948, in my opinion this unresolved labor dispute has resulted in a strike affecting a substantial part of an industry engaged in trade and commerce among the several States and with foreign nations, and in the production of goods for commerce, which strike, if permitted to continue, will imperil the national health and safety." He directed the Attorney General to petition in the name of the United States a district court of the United States to enjoin the continuance of the strike.[3]

The same day, April 3d, the United States filed in the District Court of the United States for the District of Columbia a complaint for injunctive relief, naming as defendants the Union, Lewis, Van Horn and the operators. It prayed, among other things, that the court enjoin the Union and all persons in active concert with it from "continuing the strike now in existence" and from "in any manner engaging in, permitting or encouraging the said strike". It further prayed that the court order the Union to instruct its members to cease the strike, and also order that the Union "cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue". It prayed that the court order the signatories to the contract "to engage in free collective bargaining" and "proceed in good faith with the view of bringing to an end the present dispute at the earliest possible time". It prayed for a temporary restraining order and a preliminary and a permanent injunction. Seven affidavits were attached, describing the work stoppage and its effect.

---

[3] Sec. 208 of the Act, 61 Stat. 155, 29 U.S.C.A. § 178.

The same day, April 3d, at 7:30 p. m., the District Court issued a temporary restraining order, which directed that the Union, its officers, etc., and all persons in active concert with them, be restrained pending further order of the court "from continuing the strike now in existence" and "from in any manner engaging in, permitting or encouraging" the strike. The court further ordered that the Union, through its officers, etc., forthwith instruct its members to cease the strike and immediately return to their employment. The court enjoined all defendants from encouraging, causing or engaging in the strike, and directed all signatories to the contract to proceed to collective bargaining with a view to bringing the dispute to an end. The order was to expire April 13th.

On Monday, April 5th, the temporary restraining order was served on the Union, its officers, and the other defendants.

On April 7th (Wednesday), the Union and Lewis filed a motion to dissolve and vacate the restraining order, serving notice that this motion would be heard April 9th.

The same day, April 7th, the Government filed a petition for a rule to show cause why the Union and Lewis should not be punished for civil and criminal contempt for violation of the temporary restraining order. The court issued the rule returnable at 10 o'clock, a. m., April 12th, ordering that if the alleged contempt was not sufficiently purged by the returns to the rule, a trial would be held on April 14th.

On April 10th the Speaker of the House of Representatives suggested that Senator H. Styles Bridges be appointed the third trustee of the welfare fund. His selection was made immediately by the other two trustees.

On April 11th (Sunday), the three trustees met and began consideration of a pension plan, adjourning to meet again the next morning.

On April 12th (Monday), Lewis sent two telegrams. The first was to all district presidents and members of the executive board in all coal districts of the Union, saying: "This message is for your official information and for immediate transmission to all members of the Union. The Trustee vacancy in the 1947 Welfare Fund has now been filled by the selection of the Honorable H. Styles Bridges who has accepted the appointment. An early resolution of the questions at issue may now be expected. Your voluntary cessation of work should now be terminated and your protest ended. It is the belief of the International Union and your officers that the production of coal should be resumed forthwith. It is to your best interests and those of our Union and the public welfare that this be done. Therefore, you are now officially advised that you should return to your usual employment immediately upon receipt of this telegram. This message is sent in behalf of the International Union as well as in my official capacity as President." The second telegram was to all local unions and said: "Pensions granted. The agreement is now honored." Between the two telegrams, a plan for the welfare fund suggested by Senator Bridges was adopted by his vote and that of Lewis.

The same day, April 12th, the Union and Lewis made answer to the rule to show cause, saying that the statute upon which the injunctive relief was predicated was void because unconstitutional; that the restraining order was void and beyond the jurisdiction of the court because unconstitutional; that the order violated the miners' right to stop work and their freedom from involuntary servitude, and that it violated the Labor Management Relations Act of 1947; that the petition for the rule was not in conformity with Rule 42(b) of the Rules of Criminal Procedure, 18 U.S.C.A.; and that the complaint did not state a cause of action. They denied the material allegations of fact in the petition for the rule to show cause and asserted that they had not done any act to bring about or cause the alleged strike or to permit or continue it and had committed no act which justified the issuance of either the restraining order or the rule to show cause. An affidavit of Lewis was attached, and in it he recited the appointment of Bridges and the telegram which had been sent the districts.

The same day, April 12th, the Government moved for, and the court granted, an

extension of the temporary restraining order to April 23d.

The same day, April 12th, the Government served notice that it would call the following witnesses upon the trial set for April 14th: the Chairman of the Federal Power Commission; the Director of the Railway Transport Department, Office of Defense Transportation; the Deputy Surgeon General of the United States Public Health Service; the Chief of the Bituminous Coal Section, Bureau of Mines, Department of the Interior; the Director of the Office of Program Planning, Department of Commerce; the Clerk of the United States District Court for the District of Columbia; the Secretary of the Board of Trustees of the United Mine Workers of America Welfare and Retirement Fund; and the Secretary of the International Union, United Mine Workers of America.

During the period April 5th through April 17th, carloadings of coal, by days, according to the Bureau of Mines, were:[4]

| April 5th | 8,395 cars |
|---|---|
| April 6th | 7,016 cars |
| April 7th | 6,651 cars |
| April 8th | 6,246 cars |
| April 9th | 6,570 cars |
| April 10th | 5,677 cars |
| April 12th | 4,419 cars |
| April 13th | 15,400 cars |
| April 14th | 23,703 cars |
| April 15th | 29,193 cars |
| April 16th | 32,407 cars |
| April 17th | 28,792 cars |

On April 14th and 15th trial was had before the court without a jury. The Government presented the witnesses above named, except the Deputy Surgeon General and the Clerk of the District Court, and presented other witnesses from the coal operators. The defendants rested without presenting evidence.

On April 19th the court announced its finding that the defendants were guilty of criminal contempt.

On April 20th the court fined the defendant Union $1,400,000 and the defendant Lewis $20,000.

On April 21st the court signed the formal findings, conclusions and judgment of conviction for criminal contempt. The gist of the court's conclusions was that the Union and Lewis, by the letters of February 2d and March 12th, had caused a strike; that the strike, if permitted to continue, would imperil the national health and safety; that the restraining order was to secure a return to conditions prior to the strike until the court could hear and determine the prayers of the complaint; and that Lewis and the Union had, since April 5th, willfully, wrongfully and deliberately disobeyed the restraining order.

The same day, April 21st, the court issued a preliminary injunction in about the same terms as the temporary restraining order.

On April 23d the court, upon motion by the Government and a statement of no objection by the defendants, indefinitely postponed consideration of the charges of civil contempt.

On May 18th the court dismissed the proceeding of civil contempt, upon the Government's motion. (The granting of this motion appears in the transcript of the proceedings, although no formal order seems to be in the printed appendix.)

On June 23d the Government's motion to discharge the preliminary injunction was granted.

During the period March 6th through May 1st, the production of bituminous coal, by weeks, in net tons, according to the Bureau of Mines, was:

| Week ended March 6th | 13,025,000 tons |
|---|---|
| Week ended March 13th | 13,314,000 tons |
| Week ended March 20th | 4,360,000 tons |
| Week ended March 27th | 2,120,000 tons |
| Week ended April 3rd | 2,135,000 tons |
| Week ended April 10th | 2,325,000 tons |
| Week ended April 17th | 7,715,000 tons |
| Week ended April 24th | 11,558,000 tons |
| Week ended May 1st | 13,800,000 tons |

▆ We first consider the appeal from the convictions for contempt. Many of the points made by the Union and Lewis were decided, in March of 1947, by the Supreme

---

[4] Production in tons by days does not seem to appear in the record.

Court in United States v. Mine Workers.[5] It must be kept clearly in mind that the present case does not concern the meaning of the agreement between the miners and the operators, or the right to strike, or the so-called Taft-Hartley Act. It concerns only the narrow question whether people must obey a temporary order issued by a court which seeks to maintain conditions until it can determine its authority in the dispute. The same question, under slightly different facts, was before the Supreme Court in the prior case. That Court held that people who disobey such an order of a court may be punished for contempt of court, even if it is decided later that the act under which the order was issued was unconstitutional, and even if it is later determined that the court had no jurisdiction over the dispute itself, unless the court plainly usurps power.[6] The point is simply that an order issued by a court with jurisdiction over the subject matter and the persons, in a case within its general powers, must be obeyed until reversed by orderly and proper proceedings. That is our system of government. The Chief Justice of the United States said, in the other case, "The gains, social and economic, which the miners and other citizens have realized in the past, are ultimately due to the fact that they enjoy the rights of free men under our system of government. Upon the maintenance of that system depends all future progress to which they may justly aspire." 330 U. S. at page 306, 67 S.Ct. at page 702, 91 L. Ed. 884.

The Union and Lewis say that there was no evidence that there was a "strike" or that they authorized, ordered or suggested a stoppage of work. Therefore, they say it was not proved that they committed a contempt. The trial court made specific findings of fact and concluded that beyond a reasonable doubt the Union and Lewis, after service upon them of the restraining order, willfully, wrongfully and deliberately disobeyed and violated that order. We cannot say that there was necessarily a reasonable doubt upon that score, or that the findings of fact were not supported by substantial evidence.[7] When Lewis sent his message of March 12th, the miners stopped work. When he sent the messages of April 12th, the miners returned to work. No word of any sort was sent by the Union or by Lewis to the miners between April 5th, when the court order was issued, and April 12th, when the dispute concerning the welfare fund was settled. In the long wire of the latter date, Lewis said, "Therefore, you are now officially advised that you should return to your usual employment immediately upon receipt of this telegram." It is difficult to disassociate that language from the inference that control of the stoppage lay in Lewis's hands. In their brief to us, the Union and Lewis refer to the telegrams of April 12th as orders or directions; they say "the dispute was settled and the men had been ordered to return to work"; that the "miners had been instructed to resume their employment"; twice they say that appellants "had not only directed the miners to resume production", etc. And again they say that the telegrams "sought to accomplish—and did accomplish —precisely what Government undertook in institution of its action."

Apart from the statements just quoted from their brief, the Union and Lewis contend that the existence of the dispute over the welfare fund caused the miners, individually, to walk out, and that the solution

---

[5] 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

[6] The Court cited cases which decided those points many year ago. Howat v. Kansas, 1922, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550; Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797, 809, 34 L.R.A.,N.S., 874; United States v. Shipp, 1906, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319, 8 Ann.Cas. 265. See also the discussion by Chief Judge Stephens, concurring in part and dissenting in part in Duell v. Duell, 1949, — U.S.App.D.C. —, 178 F.2d 683.

[7] Burneson v. United States, 6 Cir., 1927, 19 F.2d 780, certiorari denied, 1927, 275 U.S. 566, 48 S.Ct. 123, 72 L. Ed. 429; Keeney v. United States, 7 Cir., 1927, 17 F.2d 976; Woodside v. United States, 4 Cir., 1932, 60 F.2d 823; and other cases cited therein.

of the dispute caused them to resume work; in other words, that the status of the dispute, and not the Lewis communications, was the cause of the cessation and also of the resumption of work.

Appellants were not convicted for causing the walk-out. They were convicted because they deliberately failed to comply with the court's order of April 3d. That was a temporary order. It sought the resumption of mining, for the protection of the national health and safety, until the court could consider the contentions of the parties relative to a further injunction. It was not even a preliminary injunction, which would continue until the basic dispute had been determined. It was limited to a few days until the petitions for preliminary injunction could be heard. The Union and Lewis ignored the order until the basic dispute was settled. The evidence supports their claim that they endeavored to settle the basic dispute, but it also shows conclusively that pending the settlement of that dispute they made no attempt to restore normal production.

It seems plain enough that if Lewis had sent on April 5th telegrams of a directory or advisory nature, similar to those he sent on April 12th, neither he nor the Union would have been guilty of contempt of the court's order. When the basic objective was achieved, Lewis "officially advised" the miners to return to work. He could have officially advised them on April 5th that in view of the court's order they should return to work pending further action of the court. That is what the court ordered him to do. That is what he did not do.

■ The very narrow question thus presented is whether people must obey a temporary order of court designed to secure the orderly processes of constitutional government in a dispute of great importance, or whether a person can defy such an order. The Supreme Court held, in the other case involving these same appellants, that he who fails to obey a court order of that nature is punishable for criminal contempt. That decision governs us here.

Appellants urge that the Union cannot be held liable for the acts of the miners in stopping work. The evidence is overwhelming that the walk-out was concerted. The various communications were signed by Lewis as President of the Union, as well as Trustee. The Supreme Court held the Union liable in the prior case. But, more important, we repeat that the Union was not convicted for causing the walk-out. It was convicted because it did not exercise, or attempt to exercise, whatever powers it had to cause its members to resume work temporarily pursuant to the court's order. Quite apart from what the miners did, the Union made no attempt to direct, instruct or persuade them to return to work, and thereby it disobeyed the court's order.

■ Appellants say that the trial court erred in issuing the rule to show cause, since the rule failed to describe the proceeding as being in criminal contempt, such failure being a violation of Rule 42(b) of the Federal Rules of Criminal Procedure. The ruling of the Supreme Court upon this precise point in the prior case is controlling here.

■ Appellants say that the fines imposed were excessive "by constitutional and decisional standards." The amounts were in each instance exactly twice the fines approved by the Supreme Court upon the same parties for a similar offense a year before. The decision in the prior case was promulgated by the Supreme Court on March 6, 1947. Appellants had that decision and opinion before them when they determined upon their course of action in April of 1948. Measured by the prior fines, we think those in the case at bar were not excessive.

The judgment in No. 9943 will be affirmed.

■ We think the appeal in No. 9944 is moot. The temporary restraining order expired by its own terms, and the preliminary injunction was discharged by the trial court. The appeal in that case will, therefore, be dismissed.

No. 9943 affirmed; No. 9944 dismissed.