## UNITED STATES v. INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA.

### Civ. No. 683–50.

United States District Court
District of Columbia.
March 2, 1950.

See also 89 F.Supp. 187.

H. G. Morison, Asst. Atty. Gen., George Morris Fay, U. S. Atty., Washington D. C., Joseph M. Friedman, Sp.Asst. to Atty. Gen., Samuel K. Abrams, Asst. U. S. Atty., Jess H. Rosenberg, Atty., Dept. of Justice, Washington, D. C., Charles W. Taylor, Atty., Dept. of Justice, Washington, D. C., of counsel, for complainant.

Welly K. Hopkins, Harrison Combs, Willard P. Owens, Washington, D. C., M. E. Boiarsky, Charleston, W. Va., for respondent.

KEECH, District Judge.

This case is before the court on a rule to show cause why the respondent, International Union, United Mine Workers of America (hereinafter called the Union) should not be found guilty of both criminal and civil contempt, pursuant to the petition of the United States of America (hereinafter called the Government). On information and belief, the Government has charged that the Union has knowingly, wilfully, wrongfully, and deliberately disobeyed and violated certain provisions of the temporary restraining order issued by this court on February 11, 1950, in a proceeding under Section 208 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 178, for injunction against the present coal strike.

The Government specifically charges:

"On information and belief, at no time from and after the service of the aforesaid temporary restraining order has the defendant, International Union, United Mine Workers of America, brought to an end and ceased the strike in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948; nor has the said defendant ceased from engaging in, permitting or encouraging the said strike or its continuance.

"On information and belief, at no time from and after the service of the aforesaid temporary restraining order has the defendant, International Union, United Mine Workers of America, acting through its president and other appropriate officers, agents, servants and employees, taken all appropriate action to insure that all members of the said Union employed in the bituminous coal mines covered by the Agreement cease the said strike and that they return to their employment; nor has the said Union ceased, desisted and refrained from encouraging, inducing and permitting the said strike to continue.

"On information and belief, from and after the service of the aforesaid temporary restraining order, the defendant, International Union, United Mine Workers of America, has caused and engaged in a strike at the said bituminous coal mines, has interfered with and affected the orderly continuance of work at the said coal mines, and has engaged in and is continuing to engage in, a course of action which is interfering with this Court's jurisdiction, and which would obstruct and render fruitless the determination of this case by the Court.

"On information and belief, the strike in the bituminous coal mines of the United States owned or operated by operators and associations signatory to the said Agreement, which began on or about February 6, 1950, has continued uninterruptedly to the date of this petition.

"On information and belief, said respondent has violated the temporary restraining order issued by this Court on February 11, 1950, and is in contempt of this Court by reason of the facts aforesaid."

The Union having waived its right to jury trial on the criminal contempt charge, the charges of criminal and civil contempt have been tried together before this court. The court has heard three days of testimony and rather protracted argument of respective counsel, and since the close of the hearing has received further authorities from both parties.

The defendant in a criminal contempt proceeding has the same protection as the defendant in any other criminal case. He is presumed innocent until proved guilty, and the party seeking his conviction must prove him guilty beyond a reasonable doubt. Gompers v. Bucks Stove & Range Company, 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874. In cases of civil contempt, proof need not be beyond a reasonable doubt; but it is incumbent upon the party seeking the adjudication of contempt to prove guilt by clear and convincing evidence and not by a mere preponderance of evidence. Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 137 F.2d 77, 79; National Labor Relations Board v. Standard Trouser Co., 4 Cir., 162 F.2d 1012, 1014.

Applying these principles, and after a careful consideration of the entire record, this court concludes that the Government

has failed to prove that the Union has knowingly, wilfully, wrongfully, and deliberately disobeyed and violated the temporary restraining order of February 11, 1950, as charged in the petition for rule to show cause.

It is true that the record discloses that approximately 370,000 members of the Union were on strike—as that term is defined by the Labor-Management Relations Act, Sec. 501(2), 29 U.S.C.A. § 142(2),—as of Feburary 11, 1950, and have continued on strike to the present time; and that substantially the only Union miners working were those employed by operators who had signed a new wage agreement. It is recognized by this court that it has been held that, "as long as a union is functioning as a union it must be held responsible for the mass action of its members." United States v. International Union, United Mine Workers of America et al., D.C., 77 F.Supp. 563, 566; affirmed D.C.Cir., 177 F.2d 29; certiorari denied 338 U.S. 871, 70 S.Ct. 140. However, the facts disclosed by the record in this case do not prove—either beyond a reasonable doubt or by clear and convincing evidence—that there has been wilful contempt of this court's order on the part of the Union, by the action which it has taken or by the action which it has failed to take.

The record in this case is different from that in the 1948 contempt proceeding against the same respondent. There it was shown that the Union had "made no attempt to restore normal production." In reviewing the conviction, the United States Court of Appeals for the District of Columbia stated, 177 F.2d 29, 36: "It seems plain enough that if Lewis had sent on April 5th telegrams of a directory or advisory nature, similar to those he sent on April 12th, neither he nor the Union would have been guilty of contempt of the court's order."

Following the court's order in the instant case, various telegrams, letters, and other communications were sent by the Union to its district and local branches and members, instructing the miners to return forthwith to work.

This court does not hold that any telegram or combination of telegrams or letters would constitute a good faith compliance with an order directing action on the part of the Union. It does hold that, where the Union has sent communications such as are included in this record, the apparent good faith of such communications must be controverted not by mere suspicion based on failure to obtain results, but by clear and convincing evidence, if they are to be ruled by a court of law to constitute only a token compliance.

It was testified on behalf of the Union that no Union funds have been used to aid striking miners since issuance of the temporary restraining order. There was no attempt to disprove this testimony.

The record shows but one affirmative action which the Union might have taken but omitted to take, namely, revocation of the charters of local unions which notified Union headquarters they had voted not to comply with the back to work order, a sanction authorized by the Union's constitution. This omission, in my opinion, is not sufficient to prove either civil or criminal contempt, particularly in view of the terms of the restraining order, which directed the Union to take "all *appropriate* action * * * to insure that * * * all members of said Union * * * cease the said strike, to return to their employment." There is no showing in the record that such action would have been appropriate.

It may be that the mass strike of Union members has been ordered, encouraged, recommended, instructed, induced, or in some wise permitted by means not appearing in the record; but this court may not convict on conjecture, being bound to act only on the evidence before it, which is insufficient to support a finding of either criminal or civil contempt.

I therefore, find the respondent Union not guilty of civil or criminal contempt.

Counsel will prepare appropriate findings of fact, conclusions of law, and order.

### Findings of Fact and Conclusions of Law in Proceedings for Criminal Contempt.

Upon consideration of the entire record, the briefs, and arguments of counsel, the

Court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

1. On February 6, 1950, the President of the United States, acting under the provisions of Section 206 of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 176, hereinafter referred to as the Act, issued Executive Order 10106, whereby he created a Board of Inquiry to inquire into the issues involved in a labor dispute between certain bituminous coal operators and associations and certain of their employees represented by the International Union, United Mine Workers of America (hereinafter referred to as the Union), involving wages and terms and conditions of employment. In said Executive Order, the President expressed the opinion that such dispute had resulted or threatened to result in a strike or lockout affecting a substantial part of the bituminous coal industry, an industry engaged in trade and commerce among the several States and with foreign nations, and in the production of goods for commerce, which strike or lockout, if permitted to occur or to continue, will imperil the national health and safety.

2. The Board of Inquiry so convened by the President inquired into the issues involved in the dispute and made its written report to the President on February 11, 1950. Such report was submitted in accordance with the provisions of Section 206 of the Act. After receipt of this report, the President directed the institution of suit, stating that in his opinion the unresolved labor dispute had resulted in a strike affecting a substantial part of an industry engaged in trade and commerce among the several States and with foreign nations, and in the production of goods for commerce, which strike, if permitted to continue, would imperil the national health and safety. The President directed the Attorney General of the United States of America to institute suit on the part of the United States of America for an injunction against the continuance of the strike and for other appropriate relief.

3. Thereupon, on February 11, 1950, the United States of America brought a suit against the International Union, United Mine Workers of America; John L. Lewis, President, International Union, United Mine Workers of America; and coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948 (which said operators and associations are hereinafter sometimes referred to as the "Operators" and which said National Bituminous Coal Wage Agreement of 1948 is sometimes hereinafter referred to as the "Agreement"). The United States of America filed a verified complaint in which it asked that the defendant Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be enjoined from continuing in whole or in part the strike in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the Agreement; that they be enjoined from in any manner engaging in, permitting or encouraging the said strike or its continuation; that the said Union, acting through its president and other appropriate officers, agents, servants and employees, be ordered to instruct, and to take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment forthwith and to begin and to continue work under wages, hours, terms and conditions of employment set forth in the said Agreement, except in such instances in which new collective bargaining agreements shall have been effected between the defendant Union and any operator defendant or defendants, in which event the terms of such new agreements shall prevail; that the defendants, and each of them, be enjoined from engaging in a strike or lockout or work stoppage, in whole or in part, at any bituminous coal mines covered by the Agreement or from interfering with or affecting the orderly continuance of work as customarily scheduled at the said coal mines; that the defendants be ordered to

engage in free collective bargaining in good faith; that temporary injunctive relief be granted and for other appropriate relief, all as more fully set forth in the complaint. The said suit was instituted under the National Emergencies provisions of the Act, Sections 206–210.

4. Upon the filing of the verified complaint, and upon plaintiff's application, this Court at 11:20 a. m., on February 11, 1950, issued a temporary restraining order as prayed for by plaintiff, based upon the facts alleged in the complaint and upon affidavits filed in support of the application for the restraining order.

The restraining order directed, *inter alia*:

"Now, Therefore, it is by the Court this 11th day of February, 1950, Ordered:

"1. That the defendant, International Union, United Mine Workers of America, and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from continuing, in whole or in part, the strike now in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948 (hereinafter referred to as the Agreement), and that the said Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from in any manner engaging in, permitting or encouraging the said strike or its continuation, in whole or in part.

"2. That the said Union, acting through its president and other appropriate officers, agents, servants and employees, forthwith instruct, and take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment forthwith and to begin and to continue work under the wages, hours, terms and conditions of employment set forth in the said Agreement, except in such instances in which new collective bargaining agreements shall have been effected between the defendant Union and any operator defendant or defendants, in which event the terms of such new agreements shall prevail; and that the said Union, acting through the said officers, agents, servants, and employees cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue, in whole or in part.

"3. That the defendants, and each of them, and their officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from encouraging, causing or engaging in a lockout or strike or work stoppage, in whole or in part, at any bituminous coal mines covered by the Agreement, or from in any manner interfering with or affecting the orderly continuance of work as customarily scheduled at the said coal mines, or from changing, altering or deviating from the wages, hours, terms and conditions of employment set forth in the said Agreement, except by the mutual consent of the Union and the Operator defendant concerned, and from taking any action which would interfere with the Court's jurisdiction, or which would impair, obstruct or render fruitless the determination of this case by the Court."

The restraining order by its terms provided that it would expire at 11:20 a. m., on February 21, 1950, unless before such time the order for good cause shown should be extended, or unless the defendants should consent that it be extended for a longer period.

5. On February 20, 1950, defendants filed their answer to plaintiff's motion for preliminary injunction and a memorandum of points and authorities in support thereof. Plaintiff's motion and prayer for a preliminary injunction were heard, and, it appearing to the Court that consideration of plaintiff's application could not be completed until after 11:20 a. m., February 21, 1950, the time fixed for the expiration of the temporary restraining order, and, it further appearing to the Court that the reasons for the issuance of said order con-

tinued to exist, the Court ordered the extension of the temporary restraining order against defendants to 11:20 a. m., March 3, 1950.

6. Also, on February 20, 1950, plaintiff filed a verified petition for a rule to show cause why the defendant Union should not be punished as and for a contempt of this Court, alleging that the defendant, with full knowledge of the terms of the temporary restraining order and in defiance thereof, had knowingly, wilfully, wrongfully, and deliberately disobeyed and violated so much of said order as is set forth in paragraph 4 hereof. Annexed to said petition and in support thereof were the affidavit of William C. Hoch, Deputy Marshal in and for the District of Columbia, and a memorandum of points and authorities.

7. On said verified petition, the Court, on the same day, issued a rule to show cause, ordering the Respondent Union to appear before this Court at 10:00 a. m. o'clock on February 24, 1950, to show cause why it should not be punished as and for civil and criminal contempt of this Court. It was further ordered that, if upon the return of the respondent, it should be found that the alleged contempt had not been sufficiently purged, a trial should be held at 10:00 a. m. o'clock on February 27, 1950.

8. On the return day, respondent filed its answer to the rule to show cause and annexed to said pleading was the affidavit of John L. Lewis, Thomas Kennedy, and John Owens. In said answer, respondent asked that it be fully discharged of and from the rule to show cause and that the rule be vacated, dismissed, and fully discharged. Also, on the return day, respondent Union made its appearance in open court through counsel and made oral response to the rule to show cause in substance as set forth in its written answer.

9. Thereupon, the Court ordered that the matter be set down for trial on February 27, 1950.

10. On February 27, 1950, respondent entered a plea of not guilty to the charge of criminal contempt and a plea of not guilty to the charge of civil contempt, whereupon the case proceeded to trial before the Court, jury being waived.

11. Respondent was, before the trial, apprised of the fact that it was charged with both a criminal and a civil contempt; was advised in advance of trial of the names and identities of witnesses to be called by the complainant; and was fully and adequately informed of all facts pertinent to the charge of criminal and civil contempt.

12. Copies of the verified complaint, affidavits annexed thereto, and of the restraining order and of the rule to show cause were duly published and served upon respondent herein, as appears in the returns of service on file in this cause.

13. Responsive pleadings have been filed on the part of respondent, as more fully appears from the instant record.

14. A full and complete hearing extending over February 27, 28, and March 1, 1950, was had, at which the parties were given full opportunity to present evidence, to cross-examine witnesses, to present argument, and to avail themselves of any and all rights to which they might be entitled.

14(a). That since June 30, 1949, and on February 11, 1950, and subsequent thereto, there was not, and has not been, and is not now, in existence a written contract or agreement between respondent Union and the said bituminous coal companies and associations named as defendants in said Temporary Restraining Order issued herein on February 11, 1950.

14(b). That the National Bituminous Coal Wage Agreement of 1948 expired by its terms on June 30, 1949; that subsequent thereto and at various intervals thereafter covering a period of approximately eight months free collective bargaining negotiations were conducted by respondent Union and its officers and representatives with said bituminous coal operators seeking a new or successor agreement; and that the representatives of said operators, upon the suspension of said conferences at various times, terminated said conferences over the objection of the respondent Union, its officers and agents.

15. That approximately 370,000 members of the Union, normally employed in

the bituminous coal industry, failed to return to their employment subsequent to the issuance of said Temporary Restraining Order on February 11, 1950, and have continued to remain absent from said employment subsequent to the issuance and service of said order and the sending by said Respondent Union of said telegram of February 11, 1950.

15(a). That prior to February 11, 1950, the date of the issuance of the Temporary Restraining Order in this case, there were sporadic unauthorized stoppages of work in different sections of the bituminous coal fields involving substantial numbers of the 370,000 members of respondent Union.

15(b). The record discloses that approximately 370,000 members of the Union were on strike—as that term is defined by the Labor-Management Relations Act, Sec. 501(2)—as of February 11, 1950, and have continued on strike to the present time; and that substantially the only Union miners working were those employed by operators who had signed a new wage agreement.

16. On February 11, 1950, following the service of the Temporary Restraining Order upon respondent Union, there was dispatched to the president of each bituminous coal district in the United States by John L. Lewis, president of the Union, a telegram instructing them, and through them instructing the members of the union, of the issuance of said restraining order and requesting compliance therewith.

16(a). On February 11, 1950, following service of the Temporary Restraining Order upon respondent Union, said Union, through its President, dispatched to the spokesmen representatives of the bituminous coal companies and associations named as defendants in said order a telegram advising all coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948 that the officers and agents of the United Mine Workers of America would meet with said operators in free collective bargaining conference at Washington, D. C., on Wednesday, February 15, 1950, for the purpose of resolving present disputes and to adjust and settle all differences incident to the negotiation of a new national bituminous coal wage agreement; and that said officers and representatives of the respondent Union did so meet and have since said date continued to meet said operators in free collective bargaining conferences for said purposes.

17. On February 13, 1950, the respondent Union, by John Owens, Secretary-Treasurer, caused verbatim copies of the telegram of February 11, 1950 referred to in Finding No. 16 to be mailed to each of the approximately 2,900 local unions in the United States for their official information and for distribution to and guidance of the membership of the Union.

18. On February 15, 1950, the respondent Union caused the said telegrams of February 11, 1950 to be printed in full in the official organ of the Union, "United Mine Workers Journal", and approximately 370,000 copies of the said issue of the Journal were mailed to the individual members of the Union and to the local unions for distribution to its local membership.

19. On February 17, 1950, John L. Lewis, president of the respondent Union, dispatched telegrams to each of the local unions in all bituminous coal districts of the United States instructing them to cease forthwith all stoppages and to return to work without delay and to inform the membership of the Union of said instructions and instructing "all officers and agents * * * to carry out this policy."

20. On February 17, 1950, the respondent Union, through its executive officers, mailed a circular letter addressed to all of the local unions, members and officers of the respondent Union in all bituminous coal districts of the United States further officially instructing and requesting them to comply with the temporary restraining order issued by this Court and to take forthwith all appropriate action as may be necessary to insure that the instructions of the Court are carried out, all as set out in said letter.

20(a). That the instructions contained in the telegrams and messages of February 11 and February 17, 1950, respectively, dispatched by the respondent Union and

its officers to its local unions, officers and members have not been changed since the date of issuance.

20(b). That the witness Owens testified that the telegrams and messages dispatched on February 11 and February 17, 1950, respectively, by respondent Union and its International Officers, instructing the members of said Union to return to work forthwith and without delay and instructing all officers and agents of said Union to carry out this policy and inform all members, was the usual and customary means used by the respondent Union in other cases where there had been unauthorized work stoppages directing the men to return to work.

21. That said International Union, United Mine Workers of America, is a voluntary, unincorporated, non-profit association organized for the mutual benefit, assistance and protection of its members; that the total membership of said respondent Union is approximately 700,000 in number; that of said total membership approximately 75,000 members thereof are located in the anthracite district of the coal industry; that of said total membership approximately 25,000 members of the respondent Union are located in the Dominion of Canada; that of said total membership approximately 150,000 members of said respondent Union are affiliated with District No. 50 of said respondent Union, which said district is not engaged in the production of bituminous coal; that of said total membership approximately 40,-000 members of said respondent Union are under a new contract and agreement negotiated subsequent to the expiration of said National Bituminous Coal Wage Agreement of 1948; and that all of the above enumerated membership located in the said anthracite districts, in the Dominion of Canada, in District No. 50 and under present contract were at work and were not, and are not, included in the 370,-000 members of said Union who were engaged in work stoppages subsequent to February 11, 1950.

22. That no funds of respondent Union have been used to aid striking miners since issuance of the Temporary Restraining Order.

23. That respondent Union has not sanctioned, instructed or approved any local, district or general strike during the year 1950, before or subsequent to February 11, 1950, the date of the issuance of the Temporary Restraining Order in this case.

23(a). Respondent Union has not, pursuant to the provisions of its Constitution, sanctioned, instructed, or approved a general strike in the past twenty years.

24. Respondent, International Union, United Mine Workers of America, since service upon it on February 11, 1950, of the temporary restraining order issued by this Court on said date, has not disobeyed or violated said temporary restraining order but has fully and in good faith complied with said order and is not guilty of criminal contempt of this court.

25. The respondent Union, since service upon it on February 11, 1950, of the temporary restraining order issued by this Court on said date, has not knowingly, wilfully, wrongfully, and deliberately disobeyed and violated said order and is not guilty of criminal contempt of this court.

### Conclusions of Law.

1. Complainant has failed to prove beyond a reasonable doubt that the respondent International Union, United Mine Workers of America, since service upon it on February 11, 1950, of the Temporary Restraining Order issued by this Court on said date has knowingly, wilfully, wrongfully and deliberately disobeyed and violated said order.

2. The respondent is not guilty of criminal contempt of the order issued by this Court on February 11, 1950.