**UNITED TEXTILE WORKERS OF AMERICA, AFL–CIO, LOCAL UNION NO. 120, Plaintiff,**

v.

**NEWBERRY MILLS, INC., Defendant.**

Civ. A. No. 2810.

United States District Court
W. D. South Carolina,
Greenwood Division.

Feb. 19, 1965.

Law, Kirkland, Aaron & Alley, Columbia, S. C., for plaintiff.

Thompson, Ogletree & Haynsworth, Greenville, S. C., Blease & Griffith, Newberry, S. C., for defendant.

WYCHE, District Judge.

This action was brought by the plaintiff United Textile Workers Union of America, Local 120, for specific performance of the arbitration agreement contained in its collective bargaining agreement with the defendant Newberry Mills, Inc., wherein the plaintiff sought arbitration of the question of whether or not eighteen of its members were lawfully discharged as the result of an alleged "wildcat strike". The action arose under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, and under the Federal Declaratory Judgment

Act, 28 U.S.C.A. §§ 2201 and 2202. The defendant by way of answer set up a counterclaim seeking damages against the plaintiff for violation of the no-strike clause of the collective bargaining agreement. Both the plaintiff and the defendant moved for summary judgment on the complaint, and Honorable J. Robert Martin, Jr., United States District Judge for the Eastern and Western Districts of South Carolina, refused the motion of the defendant, and granted in part plaintiff's motion, ordering "that defendant, Newberry Mills, submit to arbitration the disputed discharges and that jurisdiction of defendant's counterclaim for damages is retained for disposition on its merits." This order was affirmed by the Court of Appeals of the Fourth Circuit on March 6, 1963, and petition for writ of certiorari was denied by the Supreme Court of the United States on October 14, 1963.

Defendant's counterclaim was tried before me without a jury.

In compliance with Rule 52(a), Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

## FINDINGS OF FACT

On August 8, 1959, the plaintiff and the defendant entered into a collective bargaining contract for a period of two years, (the contract was signed by two management representatives of the defendant, and two representatives of the United Textile Workers of America, AFL–CIO, and a committee of six employees on behalf of United Textile Workers of America, AFL–CIO, Local Union No. 120) the provisions pertinent to the counterclaim is as follows: "SECTION XVII—STRIKES AND LOCKOUTS (a) The term 'strike', as herein used, shall include any concerted stoppage or slow-down of work or other impairments of the Company's production on the part of the employees within the bargaining unit. (b) During the term of this contract, the Union shall not authorize or support any strike. (c) Neither the local Union nor the International Union shall be liable for damages for any strike under Section 301 of the Labor Management Relations Act of 1947, which neither the local Union nor the International Union does not authorize or support during the life of this agreement. (d) In the event of a strike, the Union, upon receipt of notice from the Company, shall endeavor to bring such strike to an end; and one of the steps which the Union shall take in order to bring the strike to an end shall be to cause its chief officers in this State to sign a notice which the Company shall cause to be posed, reading as follows: TO EMPLOYEES OF NEWBERRY MILLS, INC. The present strike (or other impairment of production, as the case may be), is not authorized or supported by this Union. All employees within the bargaining unit are hereby directed to return to their jobs and to cease any action which may impair the Company's production. (e) During the term of this contract, the Company shall not lock out any of its employees."

On June 9, 1960, four hundred fifty to five hundred employees in the spinning department, two hundred fifty of whom were members of the plaintiff Union, who ordinarily would have reported for work at the ten o'clock p.m. shift at the defendant Mill, remained absent from their jobs. The strike later spread to all departments of the defendant Mill and involved a considerable number of employees. However, as the strike progressed, each day some employees returned to work, and also, during this time, some new employees were hired to replace those who remained absent. This strike lasted from June 9, 1960, until approximately June 23, 1960.

James Smith, President of Local 120, J. B. Livingston, Jr., Vice President of Local 120, Walter Hiller, James Wesson, Desa Ray Wesson, Everett Koon and Geneva Street, Officers of Local 120, did not report to work during the time of the strike. None of the officers of Local 120 reported to work during the period of the strike and remained absent

from their respective jobs until the strike was over.

L. E. Gatlin, Jr., General Manager of the defendant Mill, upon receiving a telephone call at his home just after ten o'clock on the night of June 9, 1960, went to his office at the mill, and notified other key personnel and they also came to the office. Shortly after they reached the office, Mr. Gatlin went to the main gate of the mill where the people had congregated and inquired of them what the trouble was and all he learned was that the spinners on the third shift had gone on strike. He tried to determine why they had struck but was never able to get an answer. He thereupon returned to his office. Mr. Gatlin attempted to get the Committee of Local 120 to come and talk with him that night right after the strike had begun to see if the matter could be solved, but they refused. James Smith, President of Local 120, also refused to meet with the defendant company that night, saying he could not meet with them because the committee was not with him—that he personally could not "bargain" with the company—it "is the committee's job to bargain for the people". Radford Cope, International Representative of the United Textile Workers of America, was contacted by telephone by the defendant on the night of June 9, 1960, and Mr. Gatlin wrote Mr. Cope a letter dated June 10, 1960, confirming the telephone conversation of June 9, 1960, "between you and our Mr. Whitehead, and at which time he notified you of the impairment of our production due to action taken by employees within the bargaining unit" and stated "This notice is made to the Union in compliance with Section XVII of the present agreement between Newberry Mills, Inc. and United Textile Workers of America, A.F.L.–C.I.O.—Local Union No. 120. We shall expect the Union to bring such work stoppage to an end by taking whatever steps it deems necessary, and specifically by causing its chief officers in this state to sign a notice as provided for under Section XVII of existing labor management contract." A copy of this letter was sent to James Smith, President of Local 120.

On June 10, 1960, Roy Whitmire, Southern Co-Director of United Textile Workers of America, stationed in Asheville, North Carolina, telephoned Mr. Gatlin and inquired how he was getting along. Mr. Gatlin told him that they were having labor difficulties, that on Thursday night the spinners on the third shift had failed to go to work and that he had not been able to learn the reason. Mr. Whitmire then asked if there was anything he could do and Mr. Gatlin suggested that he could live up to the terms of the contract and cause some officer in the State to issue a notice to the effect that the people were to go back to work, and Mr. Whitmire remarked that he would send it in the mail. Mr. Gatlin informed him that time was of the essence and that the defendant wanted the people back at work and that he would like for him to call some official in the State to execute this notice and Mr. Whitmire then said that he would have the notice typed over his signature and wire it to him. He further stated that he thought it would be a good idea to call Yates Heffner, with the Federal Mediation and Conciliation Service, who had participated in the bargaining sessions or contract negotiations between Newberry Mills and the Union which subsequently led to the contract signed in August, 1959.

On June 13, 1960, the defendant received the following telegram, dated June 10 from Asheville, North Carolina: "To L. E. Gatlin, Jr. Newberry Mills Inc. Newberry, S. C. TO THE EMPLOYEES OF NEWBERRY MILLS INC. THE PRESENT STRIKE (OR OTHER) IMPAIRMENT OF PRODUCTION AS THE CASE MAY BE IS NOT AUTHORIZED OR (OR) SUPPORTED BY THIS UNION. ALL EMPLOYEES WITHIN THE BARGAINING UNIT ARE HEREBY DIRECTED TO RETURN TO THEIR JOBS AND TO CEASE ANY ACTION WHICH MAY IMPAIR THE COMPANYS PRODUCTION. Roy S. Whitmire Sou CA Direc-

tor United Textile Workers of America". The telegram was photocopied and posted all around the mill and at the gates by the defendant.

Neither James Smith, President of Local 120, nor any officer, nor any committeeman of Local 120, signed the notice (telegram) or any other notice to the employees to go back to work. Mr. Whitmire testified that he is the highest Union official as far as South Carolina is concerned.

Mr. Whitmire, as Southern Co-Director, on June 22, 1960, wrote a letter to William R. Beuret, Executive Vice President of Newberry Mills, Inc., with a copy to Mr. Gatlin, saying, "I am requesting that you come to Newberry to meet with us in resolving our problems."

Mr. Gatlin also had several telephone conversations and meetings with Radford Cope, International Representative of the United Textile Workers of America, who is assigned to a number of local unions, Local 120, Newberry Mills being one of them, in which he services, handles grievances, negotiates wages and contracts. Mr. Cope came to Newberry on Friday, June 11, 1960. In all of the conversations and meetings, Mr. Cope insisted that he had to have something to take to the Union, to take to Local 120, in order to get the people back to work, and that without something, he was put in a bad position, and that he was unable to do anything unless he had something to take to the Union. He mentioned in one conversation that sometimes it did not take much, but it would take something. In one conversation he said that he was just going to leave town, that the mill had not offered him anything to take to the people and he could not do anything. Mr. Gatlin reminded Mr. Cope of the contract and of the no-strike clause in it and told him that if they lived up to the contract and got the people back to work, then any problems under the terms of the contract or within the framework of the contract would be handled.

On Sunday, June 12, 1960, a meeting was finally arranged between manage-ment personnel of the defendant, and Radford Cope, International Representative of the United Textile Workers of America, and as spokesman for the General Shop Committee of Local 120, Claude Wicker, J. B. Livingston, Jr., Everett Koon, Walter Hiller, James Wesson, members of the Committee of Local 120, and James Smith, President of Local 120. Everett Koon was a shop steward of Local 120 and J. B. Livingston, Jr. was Financial Secretary of Local 120, and they with James Wesson and Walter Hiller had served on the committee which signed the contract on behalf of Local 120 in 1959. They all represented themselves as "officers of the Union". Mr. Cope handed Mr. Gatlin five typewritten pages containing conditions or demands that the defendant had to meet in order for the people to return to work, which was introduced in evidence. This memorandum of demands was not a part of the so-called "Six Point Program". The "Six Point Program" was originated by Mr. Cope and was to be used to implement the demands in the memorandum. Mr. Cope presented the program and said "This Six Point Program is what I have to have to take back to the employees. If we don't get it, then I am sure I can do nothing about getting them to come back to work." The only time the Six Point Program came up was in the meeting on Sunday afternoon and Mr. Gatlin refused to discuss it, saying that the subject at hand was that the Union was to get the people back to work and that under the contract the Union was to make every effort to encourage the employees to go back to work and when the Union got the people back to work then the defendant would discuss anything that they had to discuss under the terms of the contract. Mr. Cope said that they left him with no alternative, that the membership was having a meeting in the Union Hall and that they were waiting at that very moment for him and the committee to return and report to them on what progress they had made in their discussion with the defendant on these many different items that they proposed,

and that they would necessarily have to report to the people that they had been made no offer of anything, and that he knew he would not be able to get them to come back to work unless there was something to offer. None of the committeemen of the Union during the meeting agreed to go back to work and Mr. Cope did not ask them to go gack to work, but they were very definite about not going back to work, they insisted that they had to have something. They wanted to be sure too that even if the people came back to work that nobody would be disciplined. Mr. Cope, as International Representative, the general committeemen of Local 120, the people who were representing the Union, and the officers of Local 120, and Mr. Silcox, a Vice President of the International Union, United Textile Workers of America, after he came into the matter, were insistent that the defendant promise that nobody would be disciplined if they came back to work.

The defendant did not give the strikers anything they demanded in order to get them back to work.

James Smith, President of Local 120, and Mr. Cope on one occasion, at the request of the Mayor of the City of New-Berry, went to one of the entrances of the mill to check on some trouble on the picket line and Mr. Smith told the crowd at the gate "Don't block that gate. Let people go through". James Smith presided over the Union meetings which were held at the Union Hall during the strike. On the night of June 9, 1960, when the strike started, the Union Hall was open. It ordinarily would have been closed.

There were shop stewards and committeemen of Local 120 who walked the picket line.

William Lyles, an employee of the defendant, who did not participate in the strike, and who walked through the picket line every night, except one when the strikers were crowding the gate, heard James Smith (President of Local 120) say to the people in the Union Hall, "The Union is not supporting this strike. But you all have got Gatlin in a vise and don't you slacken. Just keep tightening."

Julia Derrick, an employee of the defendant during June, 1960, and a member of the Union at that time, attended at least one Union meeting and heard James Smith, President of Local 120, tell the people, "if we would stick together, we could win".

Joel Derrick, an employee of the defendant, on the morning after the strike, when he went to work, had a conversation with Everett Koon, who was shop steward on the first shift and general committeeman of Local 120. Derrick asked Koon what was wrong, when he saw a large crowd standing out across the street, and Koon said that "the spinners and battery fillers had walked out. * * We are going to stick with them. Don't go in"; however, Mr. Derrick went on in the mill to work. On different occasions Derrick saw James Smith, President of Local 120, riding by the mill waving at the strikers who were out across the street in front of various gates. During the strike Derrick observed Geneva Street, shop steward on the third shift in the spinning department, standing with other employees on strike at the back gate on Drayton Street.

Mrs. Irene Oxner, an employee of the defendant mill, who did not participate in the strike, and worked during the strike except one night, and on this night when she went to work she was unable to get through the picket line and while she was still standing at the gate James Smith, President of Local 120, drove up in a car and stopped and said to the crowd of strikers who had the gate blocked, "Y'll got them where we want them; let's hold them there," or words to that effect. She left after she heard Mr. Smith say this.

Mrs. Effie Motes, an employee of the defendant mill, who was not a union member, and did not participate in the strike, started in the mill to work when Elise Williams, who was on strike, said to her, "I advise you not to go in, if you know what's good for you." On the

night before the strike, Mrs. Geneva Street and Mrs. Kinard, members of the Union, were in the water house when Mrs. Motes went in, and they asked her if she would stay out with them the next night, that they were going on strike.

The testimony of the plaintiff shows that all the Union did to get the people back to work was to send the telegram (notice), required by the contract, which was received by the defendant on June 13, 1960, after the strike had begun on June 9, 1960, and at the meetings in the Union Hall the people were told in a group by the Union Officers and Officials that they should go gack to work. One committeeman of Local 120 testified that he contacted three strikers individually.

Under the foregoing facts, I must conclude that the officers, committeemen and shop stewards of Local Union 120, authorized and supported the strike and did not endeavor to get the employees back to work, in violation of the terms of the no-strike clause of the contract, and that the officers of the International Union encouraged the strike by their actions and exerted their efforts to trying to get demands and concessions, the Six Point Program having been originated by one of its officers, granted instead of trying to get the people back to work, which, in my opinion, is tantamount to authorizing and supporting the strike, in violation of the contract.

As to alleged damages suffered by defendant, only one witness testified as to any element of profit and loss. Certain figures were introduced which concerned only the labor cost per pound of the product produced or claimed to have been produced during the period prior to, during, and after the strike. Not only do costs of labor go into a profit and loss statement, but many other factors, such as, depreciation, interest, if any, overhead, the costs of the raw materials, the sales cost and the amount of the product sold and the price received for that product. Only when all of these factors are considered can it be determined whether a business has operated at a loss or at a profit. I cannot determine from the evidence presented that the defendant has suffered a loss of any amount of dollars, in fact, there is nothing to rebut the possibility that the defendant may have actually made a profit during the period of the strike. Quite often mills curtail and while the labor cost per pound of product produced during a period of curtailment may be somewhat higher, many other factors, of course, are eliminated or reduced so that the actual overall result may well be a profit or a break-even.

There is no basis in the record to support any award of damages since the records and figures which would be necessary to support damages have not been submitted and the defendant admits that they are not available.

The defendant has failed to prove by the greater weight of the evidence that it has suffered any damages as a result of the strike.

The defendant, therefore, in my opinion, is not entitled to judgment on its counterclaim.

## CONCLUSIONS OF LAW

I have gone into minute detail in the Findings of Fact because my Conclusions of Law are based upon circumstantial, as well as direct evidence.

 Facts in issue may be proved either by direct evidence, or by indirect, otherwise called circumstantial evidence. By direct evidence of a fact is meant the statements of persons who have perceived its existence by means of their senses, or the production of the thing itself before the court, where the fact to be proved is its present existence or condition. By indirect evidence is meant the proof of some other fact or facts from which, taken either singly or collectively, the existence of the particular fact in question may be inferred as a necessary or probable consequence. Facts not directly in issue, but which may be proved for the purpose of establishing the existence or non-existence of any fact in issue, are called "facts relevant to the issue". These facts relevant to the issue may be proved either by direct or indirect evidence in the same

manner as a fact in issue, and so also may any facts which are relevant to prove them, unless in the opinion of the Court the facts offered for this purpose are too remote from the issues on trial to be material. Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist. When the requirements of the law as to circumstantial evidence are present, circumstantial evidence is just as good as direct evidence.

■ 29 U.S.C.A. § 301(b) makes it possible for a labor organization, representing employees in an industry affecting commerce, to sue and be sued as an entity in the federal courts without regard to the amount in controversy or without regard to the citizenship of the parties. The substantive law to be applied in suits under 29 U.S.C.A. § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440.

■ The defendant has proved by the greater weight of the evidence that the plaintiff participated, condoned, authorized and supported the strike by overt actions of the Union in its official capacity.

The plaintiff did not upon receipt of notice from the defendant of the strike endeavor to bring such strike to an end.

■ As long as a union is functioning as a union it must be held responsible for the mass action of its members. It is perfectly obvious not only in objective reasoning but because of experience that men don't act collectively without leadership. The idea of suggesting that the number of people who went on strike would all get the same idea at once, independently of leadership, and walk out of defendant's mill "is of course simply ridiculous". A union that is functioning must be held responsible for the mass action of its members. The above stated principles of law will preserve the union, "because if the plan is adopted throughout the country of trying to use a wink, a nod, a code, instead of the word 'strike', and if that sort of a maneuver is recognized as valid by the Courts" then we "will have among the unions lawlessness, chaos, and ultimate anarchy. And then the unions will have to be socialized. In other words, they will have to be destroyed." United States v. International Union, U.M.W. of A. (D.C., D.C., 1948) 77 F.Supp. 563 (affirmed, 85 U.S.App.D.C. 149, 177 F.2d 29; cert. den. 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535).

Whether the plaintiff breached the contract or not, the defendant has failed to prove any damages it suffered as a result of the strike. The most that can be said is that the claim of the defendant for damages is merely speculative. The strike may have caused the defendant a loss and it may have caused it a gain. There is no definite way to determine this without the introduction of all of the records of the defendant, which the defendant at the trial said were in New York, and not available. I allowed the defendant time to put the records in evidence and I have now been notified that the records are not available and that the defendant does not wish to put any further evidence in the record.

For the foregoing reasons the defendant is not entitled to recover judgment against the plaintiff on its counterclaim, and judgment is directed to be entered accordingly, and

It is so ordered.