# UNITED STATES v. INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA.

## No. 10553.

United States Court of Appeals.
District of Columbia Circuit.

Argued April 26, 1950.

Decided April 12, 1951.

See also 89 F.Supp. 187.

H. G. Morison, Asst. Atty. Gen., with whom George Morris Fay, U. S. Atty., Washington, D. C., Joseph M. Friedman, Special Asst. to the Atty. Gen., Jess H. Rosenberg, Atty., Department of Justice, and Samuel K. Abrams, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellant.

Welly K. Hopkins, Washington, D. C., with whom Harrison Combs, Willard P. Owens, Washington, D. C., and M. E. Boiarsky, Charleston, W. Va., were on the brief, for appellee.

Before STEPHENS, Chief Judge, and PRETTYMAN and FAHY, Circuit Judges.

STEPHENS, Chief Judge.

This is an appeal by the United States (hereafter referred to as the Government) from a judgment of the United States District Court for the District of Columbia entered March 4, 1950. The judgment dismissed a petition for a rule to show cause against the appellee, International Union, United Mine Workers of America (hereafter referred to as the Union), dismissed a rule to show cause issued pursuant to the petition, and adjudged that the Union was not guilty of civil contempt for failure, as charged in the petition, to comply with a temporary restraining order issued by the District Court.

The National Bituminous Coal Wage Agreement of 1948 (hereafter referred to as the Agreement of 1948), entered into between the Union and numerous Coal Operators and Associations (hereafter referred to as Operators) expired by its own terms on June 30, 1949. A dispute arose as to the terms and conditions of a successor agreement and no successor agreement was entered into until March 4, 1950. In late December, 1949, sporadic work stoppages commenced in the bituminous coal mines in the United States. These increased so that by the early part of 1950 there was a substantial diminution in bituminous coal production. On February 11, 1950, the Attorney General, at the direction of the President acting pursuant to Section 208 of the Labor Management Relations Act, 1947, 29 U.S.C. § 178 (hereafter referred to as the Act), instituted, by filing a complaint, the proceeding out of which this appeal has arisen.[1] The complaint named the Government as plaintiff and the Union and John L. Lewis, its president, and some one hundred and one Operators, as defendants. The complaint alleged the existence of an unresolved labor dispute between the Union and the Operators and the existence of a strike affecting a substantial part of an industry engaged in trade and commerce among the several states and with foreign nations and in the production of goods for commerce; that if permitted to continue, the strike would imperil the national health and safety; that the strike was a concerted work stoppage on the part of the Union which had continued since on or about February 6, 1950, and was preceded by, or was a continuation of, a number of successive concerted total or partial stoppages of work on the part of the Union commenced in the early summer of 1949, of varying periods of duration, and affecting coal mining operations in various areas in the United States; that the strike and its predecessor work stoppages had resulted from unresolved labor disputes affecting wages, hours, terms and conditions of employment attending the failure of the Union and the Operators, or a great majority of them, signatory to the Agreement of 1948, to agree to a continuance thereof beyond June 30, 1949, or to execute a successor agreement or agreements; that unless the strike was enjoined, the Government would suffer irreparable injury for which it had no adequate remedy at law.[2] The complaint prayed that the District Court: (1) enjoin the Union from continuing the strike; (2) order the Union to instruct, and take all appropriate action necessary to insure that the instructions were carried out, all members of the Union to cease the strike and to return to work

1. Prior to directing the Attorney General to file the complaint, the President, acting pursuant to Section 206 of the Act, 29 U.S.C. § 176, had appointed a Board of Inquiry to inquire into the issues involved in the dispute between the Union and the Operators and to make a written report to him. The Board of Inquiry submitted a report on February 11, 1950.

2. Annexed to the complaint were affidavits attesting the vital position in the national economy of the bituminous coal industry and the peril to the national health and safety involved in a continuance of the strike. These were executed by the Secretary of Commerce, the Secretary of Defense, the Secretary of the Interior, the Chairman of the Federal Power Commission, the Chairman of the United States Maritime Commission, and the Surgeon General of the United States Public Health Service.

in the mines under the terms and conditions of employment of the 1948 Agreement; (3) enjoin both the Union and the Operators from encouraging, causing or engaging in a lockout or strike at any bituminous coal mine covered by the 1948 Agreement; (4) order the Union and the Operators to engage in free and collective bargaining for the purpose of resolving their disputes, as contemplated by the Act; (5) issue, pending the final determination of the case, a preliminary injunction enjoining the Union and the Operators in the manner and form aforesaid; (6) issue, pending the issuance of the preliminary injunction, a temporary restraining order restraining and enjoining the Union and the Operators in the manner and form aforesaid; (7) grant such other and further relief to the Government as might be just and proper.

Upon the filing of the complaint, and upon the same date, February 11, 1950, the District Court, acting *ex parte* and upon the basis of the allegations of the complaint and of the statements in the supporting affidavits and in the Report of the Board of Inquiry, issued against the Union and John L. Lewis and the Operators, the temporary restraining order prayed for. The order reflected the first four paragraphs of the prayer. Its text is set forth in the margin.[3] The order, stating its terms briefly: (1) restrained the Union from continuing the strike; (2) directed the Union to instruct, and to take all ap-

---

3. The text of the temporary restraining order is as follows:

NOW, THEREFORE, it is by the Court this 11th day of February, 1950, ORDERED:

1. That the defendant, International Union, United Mine Workers of America, and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from continuing, in whole or in part, the strike now in existence at bituminous coal mines throughout the United States of America owned or operated by coal operators and associations signatory to the National Bituminous Coal Wage Agreement of 1948 (hereinafter referred to as the Agreement), and that the said Union and its officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from in any manner engaging in, permitting or encouraging the said strike or its continuation, in whole or in part.

2. That the said Union, acting through its president and other appropriate officers, agents, servants and employees, forthwith instruct, and take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment forthwith and to begin and to continue work under the wages, hours, terms and conditions of employment set forth in the said Agreement, except in such instances in which new collective bargaining agreements shall have been effected between the defendant Union and any operator defendant or defendants, in which event the terms of such new agreements shall prevail; and that the said Union, acting through the said officers, agents, servants, and employees cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue, in whole or in part.

3. That the defendants, and each of them, and their officers, agents, servants and employees, and all persons in active concert or participation with them, be and they hereby are restrained pending further order of this Court from encouraging, causing or engaging in a lockout or strike or work stoppage, in whole or in part, at any bituminous coal mines covered by the Agreement, or from in any manner interfering with or affecting the orderly continuance of work as customarily scheduled at the said coal mines, or from changing, altering or deviating from the wages, hours, terms and conditions of employment set forth in the said Agreement, except by the mutual consent of the Union and the Operator defendant concerned, and from taking any action which would interfere with the Court's jurisdiction, or which would impair, obstruct or render fruitless the determination of this case by the Court.

4. That the defendants engage in free collective bargaining in good faith for the purpose of resolving their disputes and that they make every effort to adjust and settle their differences as contemplated by the National Emergencies

propriate action necessary to insure that the instructions were carried out, all members of the Union employed in the mines to cease the strike and to return to their employment; (3) restrained both the Union and the Operators from causing or engaging in a lockout or strike or work stoppage; (4) directed the Union and the Operators to engage in collective bargaining for the purpose of resolving their disputes. The order was served upon the Union and John L. Lewis, president, on the date of its issuance. The order as issued expired at 11:20 A.M., February 21, 1950. On February 20, 1950, the District Court extended it to 11:20 A.M., March 3, 1950.

Notwithstanding the issuance and service of the restraining order, the work stoppage in the bituminous coal mines continued, and on February 20, 1950, the Government filed a petition for a rule requiring the Union to show cause why it should not be punished for civil and criminal contempt of the District Court. The petition recited the filing of the complaint and the issuance and service of the temporary restraining order and charged violation of the first three paragraphs thereof. In brief, the petition charged that at no time after the service of the order had the Union brought the strike to an end or taken appropriate action to insure that the Union miners discontinue the strike and return to their employment; that, on the contrary, the Union had continued to cause and engage in a strike at the mines and had engaged in a course of action interfering with the jurisdiction of the court and obstructing the determination of the case; and that the strike had continued uninterruptedly to the date of the filing of the petition. Following the filing of

the petition for the rule on February 20, 1950, the District Court, on the same day, issued a rule against the Union requiring it to show cause on February 27, 1950, why it should not be punished for civil and criminal contempt. The rule directed that if upon the return by the Union it should be found that the alleged contempt had not been sufficiently purged, a trial should be had.

On February 24, 1950, the Union filed its answer to the rule and to the petition for the rule. The answer attacked the jurisdiction of the District Court to issue the temporary restraining order and the rule, attacked the constitutionality of the Act and of the restraining order, and asserted that the order violated the rights of the members of the Union as miners not to work, particularly in the absence of a collective bargaining agreement. The answer averred that the Executive Board of the Union had not issued a strike call or requested a referendum for the approval of a strike call, or done any act to cause, permit or encourage the alleged strike or its continuance.[4] The answer then described steps assertedly taken by the Union, through its officers, to obtain obedience to the instructions of the District Court in the restraining order and to end the work stoppages—in particular the sending of telegraphic messages to the Union's district presidents, officers and agents, copies of the same to each of the local unions, publication of the same in the United Mine Workers Journal, and the sending of a report to all local union officers and members instructing immediate obedience to the directions of the District Court in the restraining order and termination of the work stoppages and return of the miners to work. The answer averred further

provisions of the Labor Management Relations Act, 1947.

5. That this restraining order shall expire at 11:20 a. m. o'clock a. m. [sic] on February 21, 1950, unless before such time the order for good cause shown is extended, or unless the defendants consent that it may be extended for a longer period.

6. That plaintiff's motion for a preliminary injunction be set down for hear-

ing on February 20, 1950, at 10 o'clock a. m. in the Motions Court.

4. The answer referred to the Constitution of the Union, Article IX, Section 27, providing: "The Board shall have power between Conventions, by a two-thirds vote, to recommend the calling of a general strike, but under no circumstances shall it call such a strike until approved by a referendum vote of the members."

that despite such messages, instructions and endeavors on the part of the Union to persuade its members to return to work, they, not being under obligation to work by virtue of any existing contract, and having a legal right to sell or not to sell their labor and to sell it upon such terms and conditions as they chose, refused to return to work and determined to continue the work stoppages which, according to the assertions of the answer, they had of their individual volition decided upon prior to the issuance of the restraining order. The answer asserted that the means employed by the Union to cause its members to return to work were those which it had on prior occasions successfully employed and that only powers of recommendation were available to the Union and its officers under the Union's Constitution. The answer alleged finally that the refusal of the miners to return to work was without suggestion, direction or authorization of the Union and was contrary to the directions given by the Union as above described.[5]

On February 27, 1950, the Union, after denial by the District Court of a motion that the rule to show cause and the petition for the rule be dismissed and the Union discharged from the rule, entered a plea of not guilty to the charges of civil and criminal contempt and waived trial by a jury. The cause, under the issues made up by the pleadings above described, came on for hearing on February 27 and 28, and March 1, 1950, before the District Court sitting without a jury.

It is not necessary, in view of the disposition which we are obliged, as appears below, to make of this appeal, to describe in detail the evidence relied upon by the Government in support of the petition for the rule, and by the Union in support of its answer. This evidence is, however, summarized in the margin.[6] It is sufficient

---

5. Attached to the answer and made a part thereof was a supporting affidavit of the president, the vice president, and the secretary-treasurer of the Union.

6. The Union relied upon evidence to the effect that: Since June 30, 1949, on which date the Agreement of 1948 expired, and on February 11, 1950 (the date of the issuance of the temporary restraining order) and subsequent thereto, including the time of the trial, there had been in existence no written agreement between the Union and the Operators named as defendants in the restraining order. At various intervals after the expiration of the 1948 Agreement free collective bargaining negotiations seeking a successor agreement were conducted by the Union and its representatives with the Operators. The representatives of the Operators, upon suspension of these conferences at various times, terminated the same over the objection of the Union. On February 11, 1950, following the service of the temporary restraining order, there was dispatched to the president of each bituminous coal district in the United States by John L. Lewis as president of the Union a telegram advising them, and through them, the members of the Union, of the issuance of the restraining order and stating that "This office, therefore, by reason of the requirements of this injunction, has no alternative other than to instruct you and all other agents of our union similarly situated. which I hereby do, to take all appropriate action as may be necessary to insure that the instructions of the court are carried out, and that all members of our union in the bituminous coal mines covered by the Agreement in question cease said strike and return to their employment forthwith . . .." On the same date, following service of the restraining order, the Union, through John L. Lewis, dispatched to the spokesmen representatives of the Operators named as defendants in the restraining order, a telegram advising all Operators signatory to the Agreement of 1948 that the representatives of the Union would meet with them in a free and collective bargaining conference on Wednesday, February 15, 1950, for the purpose of resolving disputes and adjusting and settling differences incident to the negotiation of a new agreement. The officers and representatives of the Union did so meet with the Operators for the purposes mentioned. On February 13, 1950, the Union, through its secretary-treasurer, John Owens, caused verbatim copies of the telegram of February 11, 1950, dispatched to the president of each bituminous coal district, to be mailed to each of the local unions, some 2,900 in number, for their official information and for distribution to and guidance of the membership of the Union. On February 15, 1950, the Union caused the telegram of February 11, 1950, last referred to, to

here to state that after completion of the hearing on March 1, 1950, the District Court, on March 4 following, found that the Union had not, since service upon it on February 11, 1950, of the temporary restraining order, disobeyed or violated the same, but that it had followed and in good faith complied therewith; and the court concluded that the Union was not guilty of civil contempt of the District

be printed in the United Mine Workers Journal, the official organ of the Union, and caused approximately 370,000 copies of the Journal to be mailed to the individual members of the Union and of the local unions for distribution to their local membership. On February 17, 1950, John L. Lewis, as president of the Union, dispatched telegrams to each of the local unions in all bituminous coal districts of the United States, instructing them to cease forthwith all stoppages and to return to work without delay and directing them to inform the membership of the Union of these instructions, and directing all officers and agents to carry out this policy. On February 17, 1950, the Union, acting through its executive officers, mailed a report addressed to all local unions, members and officers of the Union in all bituminous coal districts further officially instructing them to comply with the temporary restraining order and to take forthwith all appropriate action necessary to insure that the instructions of the District Court in the restraining order were carried out. The instructions contained in the telegrams and messages of February 11 and 17, 1950, were not changed after issuance, were given without reservations, were intended to be unequivocal directions to the membership of the Union and were given with the expectation that the miners would return to work. These telegrams and messages were the usual and customary means used by the Union in other instances where there had been unauthorized work stoppages in directing the members of the Union to return to work. The total membership of the Union was approximately 700,000, of which 75,000 were located in the anthracite districts of the coal industry, of which 25,000 were located in the Dominion of Canada, of which 150,000 were affiliated with District No. 50, which was not engaged in the production of bituminous coal, and of which approximately 40,000 were under a new agreement negotiated subsequent to the expiration of the 1948 Agreement. The enumerated membership in the anthracite districts, the Dominion of Canada, District No. 50, and under new contract were at work and were not included in the 370,000 members of the Union engaged in work stoppages subsequent to February 11, 1950. All mem-

bers of the Union had an equity in the assets thereof. The Union had not sanctioned, instructed or approved any local, district or general strike during the year 1950 before or subsequent to February 11, 1950, and had not sanctioned, instructed or approved a general strike in the past twenty years. The recommendation of the Union in respect of the present labor dispute had been for a three-day work week following the expiration on June 30, 1949, of the Agreement of 1948. No funds of the Union had been used to aid striking miners since the issuance of the temporary restraining order and the Union had refused to accept all contributions offered it in support of the work stoppages.

The Government relied upon evidence to the effect that: A letter of January 31, 1950, from the President to the president of the Union and to the Operators proposed the maintenance of normal production of coal for seventy days, beginning February 6, 1950, during which time a fact-finding board to be appointed by the President would inquire into the dispute and make recommendations which would not bind the parties. On February 4, 1950, John L. Lewis, president of the Union, rejected this offer in a letter asserting, in respect of the prospect of an injunction to compel the members of the Union to return to work, that "It is questionable whether one could postulate that such mass coercion would insure enthusiastic service from grateful men." This letter was included in the February 15, 1950 issue of the United Mine Workers Journal distributed to the bituminous coal mine membership of the Union. The total production of bituminous coal for the week ended February 11, 1950, was about 80% below normal. Approximately 85% of the bituminous coal miners of the United States were members of the Union and of such membership between 90% and 95% were not at work during the week ended February 11, 1950. The lowered rate of production and the number of members of the Union absent from the mines continued through the week ended February 18, 1950, and through February 20, 21 and 22. Some 370,000 bituminous coal miners who were members of the Union were not working on February 11, 1950, and did not return to their employment

Court. On the same date the District Court adjudged, ordered and decreed that the Union was not guilty of civil contempt and that the petition for a rule to show cause and the rule itself and the proceeding for civil contempt should be dismissed and the Union discharged.[7] On the same date the court determined that "there is no just reason for delay" and ordered that "final judgment in these proceedings for civil contempt be entered forthwith."[8] On the date of the entry of the judgment of not guilty of civil contempt, March 4, 1950, this appeal was taken.

The Government's points on appeal, as stated in its brief, are, first, that: "The nationwide mass work stoppage after February 11, 1950, by the virtual totality of the Union's membership in the bituminous coal industry was a continuation of a strike by the Union. As such it constituted clear, unequivocal, and wilful disobedience and contempt by the Union of the temporary restraining order which in express language enjoined the Union from continuing the strike;" second, that: "The Union wilfully and deliberately disobeyed and contemned the temporary restraining order by not taking, through its president and other officers, 'all appropriate action as may be necessary to insure' the carrying out of the instructions to the members of the Union to return to work and cease the strike. The finding to the contrary made

---

at any time after service of the temporary restraining order on that date. As of the week ended February 11, 1950, the estimated stock of bituminous coal on hand in the United States totaled only about sixteen days' supply and at the consumption rate of December, 1949, there would, on March 11, 1950, be a deficit in the nation's bituminous coal supply of 7,200,000 tons. At the time of a work stoppage in the bituminous coal industry by members of the Union in December, 1946, John L. Lewis, president of the Union, sent a letter to all members of the Union and to all local unions in the bituminous districts of the United States couched (according to the Government's contention) in more effective terms than the telegrams and messages sent by the Union in the instant case. This single communication in 1946, in a situation similar to that involved in the instant case, resulted in a successful termination of the strike and immediate resumption of coal production. In response to the Union's telegram of February 11, 1950, instructing the Union members to return to work in obedience to the temporary restraining order, telegrams were received by the Union officials from a number of local unions stating that the members of these locals declined to return to work until a contract had been signed.

7. The theory of the District Court's decision, as shown by a memorandum opinion, 89 F.Supp. 179, was that: It was incumbent upon the Government, seeking an adjudication of civil contempt, to prove by clear and convincing evidence that the Union had wilfully disobeyed the temporary restraining order and that the Government had failed to make such proof. The apparent good faith of the various communications sent by the Union instructing the miners to return to work had not been controverted by clear and convincing evidence, and therefore the Union could not be found guilty of civil contempt, notwithstanding the refusal of the miner members to return to work. The case was to be differentiated from International Union, United Mine Workers of America v. United States, 85 U.S.App.D.C. 149, 177 F.2d 29 (1949), because it was in that case shown that the Union had made no attempt to restore normal production. The evidence in the instant case showed but one affirmative action which the Union might have taken, but omitted to take, to wit, revocation of the charters of local unions which notified Union headquarters that they had voted not to comply with the order to return to work—a sanction authorized by the Union's Constitution. This omission was not sufficient to prove civil contempt, particularly in view of the terms of the restraining order which directed the Union to "instruct, and take all appropriate action as may be necessary to insure that such instructions are carried out, all members of the said Union employed in the bituminous coal mines covered by the Agreement to cease the said strike, to return to their employment . . . .." There was no evidence that the revocation of the charters would have been appropriate.

8. This order and direction for the entry of judgment was apparently made as a compliance with Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S.C.

by the district court is clearly erroneous." As argued, these points on the merits are, stating them in reverse order: That there was no substantial evidence to support the finding of the trial court that the Union had not disobeyed the temporary restraining order but had followed and in good faith complied with the same; but that even if the trial court's finding in respect of the Union as an entity acting through its officers was supported by the evidence, nevertheless the Union must be held legally responsible for the mass action of its members in not returning to work after the service of the restraining order.

The Union contends, first, that the civil contempt judgment was interlocutory and not final and is therefore not appealable under Section 1291 of Title 28 of the United States Code, and that the court is therefore without jurisdiction of the appeal; second, that the appeal is moot and should for that reason be dismissed. On the contingency that the court should decide against it upon the two contentions just stated, the Union argues further that the Government's points on appeal, as stated in the brief and argued, are both without merit.

█ If this case is moot it is not necessary to pass upon the question of the jurisdiction of the court to consider the appeal. If this case is moot it is not possible for the court to determine the two points urged by the Government which involve the merits; settled principles of our jurisprudence forbid United States Courts to decide abstract questions. As the Supreme Court said in California v. San Pablo &c. Railroad, 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893) and reiterated in United States v. Hamburg-American Co., 239 U.S. 466, 475–476, 36 S.Ct. 212, 60 L.Ed. 387 (1916): "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." See also Brownlow v. Schwartz, 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620 (1923); Stearns v. Wood, 236 U.S. 75, 35 S.Ct. 229, 59 L.Ed. 475 (1915); Richardson v. McChesney, 218 U.S. 487, 31 S.Ct. 43, 54 L.Ed. 1121 (1910); Jones v. Montague, 194 U.S. 147, 24 S.Ct. 611, 48 L.Ed. 913 (1904); Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293 (1895); Cheong Ah Moy v. United States, 113 U.S. 216, 5 S.Ct. 431, 28 L.Ed. 983 (1885); Lord v. Veazie, 8 How. 251, 12 L.Ed. 1067 (U.S. 1850); Spreckels Sugar Co. v. Wickard, 75 U.S.App.D.C. 44, 131 F.2d 12 (1941).

█ The considerations urged in support of the contention of the Union that this case is moot are that pending the appeal, on or about March 5, 1950, the labor dispute between the Union and the Operators was settled by the execution of the National Bituminous Coal Wage Agreement of 1950; that the work stoppages ceased and the miner members of the Union returned to their employment on March 6, 1950; that they have ever since continued in their employment in the mines; that normal production of bituminous coal was restored and the national emergency came to an end.[9] The Union contends that the objectives of the injunction proceeding and of the civil contempt proceeding having thus eventuated and the necessity for civil contempt sanctions having thus been

9. This is made to appear as follows: On March 3, 1950, the District Court issued the preliminary injunction prayed for in the Government's complaint. On March 29, 1950, the Government filed in this court a motion for leave to move in the District Court for discharge of the preliminary injunction. In that motion the Government, among other things, asserted that: ". . . the Attorney General is informed and verily believes that a settlement of the dispute giving rise to the injunctive proceedings herein was reached between the respective parties defendant to the said proceeding on or about March 5, 1950. The Attorney

removed the civil contempt issue is moot and the appeal must be dismissed. We think this contention is correct.

█ A civil contempt proceeding is wholly remedial, to serve only the purposes of the complainant, not to deter offenses against the public or to vindicate the authority of the court. Penfield Co. v. Securities & Exchange Comm., 330 U.S. 585, 590 et seq., 67 S.Ct. 918, 91 L.Ed. 1117 (1947); McCrone v. United States, 307 U.S. 61, 64, 59 S.Ct. 685, 83 L.Ed. 1108 (1939); Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441 et seq., 31 S.Ct. 492, 55 L.Ed. 797 (1911). While the petition for the rule to show cause in the instant case sought punishment of the Union for both civil and criminal contempt for the alleged failure to obey the temporary restraining order, this appeal involves only the judgment of not guilty of civil contempt and the dismissal of the contempt proceeding in its civil aspect. The Government, as complainant, sought by the contempt proceeding in its civil aspect to coerce the Union into obeying the restraining order and sought thus to accomplish the return of the miner members of the Union to their work in the mines. These objectives were accomplished when, pending the appeal, the labor dispute was settled, the miner members of the Union returned to their employment, normal production of bituminous coal was restored and the national emergency was thus brought to an end. It is clear that under these circumstances the contempt proceeding is moot. Brownlow v. Schwartz, supra; Gompers v. Bucks Stove & Range Co., supra; Buck's Stove & Range Co. v. Am. Fed. of Labor, 219 U.S. 581, 31 S.Ct. 472, 55 L.Ed. 345 (1911). In Brownlow v. Schwartz, as in the instant case, an act ordered to be performed occurred before the appeal came on to be heard. In the Brownlow case the Court of Appeals of the District of Columbia had reversed a decree of the Supreme Court of the District of Columbia dismissing a petition for a writ of mandamus to compel the issuance by the Building Inspector of the District of a permit for the construction of a building and had remanded with directions to issue the writ. A writ of error was allowed by the Supreme Court of the United States, but before its allowance the building permit was issued and the building in question was constructed. On these facts the Supreme Court held that the case had become moot and was therefore no longer a subject appropriate for judicial action. The Court said: "It thus appears that there is now no actual controversy between the parties—no issue on the merits which this Court can properly decide. The case has become moot . . . (1) because the permit, the issuance of which constituted the sole relief sought by petitioner, has been issued and the building to which it related has been completed . . . .[10] This Court will not proceed to a determination when its judgment would be wholly ineffectual for want of a subject matter on which it could operate.

General is further informed and verily believes that the striking employees in the bituminous coal industry of the nation have subsequently returned to their employment, that normal production of bituminous coal has now been restored, and that, in consequence, the national emergency giving rise to the injunctive proceedings no longer exists." In its answer and objection to this motion the Union admitted: " . . . that such employees in the bituminous coal industry of the nation, who had been absent from their work, returned to their employment on March 6, 1950, and have since said date continued in their said employment; that normal production of bituminous coal has now been restored;

and that the national emergency, if any there was (which Appellee denies), giving rise to the injunction proceedings, no longer exists." The substance of the foregoing is admitted also in the briefs of the Government and of the Union on this appeal.

10. The Court held the case moot for an additional reason, to wit: That pending the appeal the petitioner had conveyed all of her interest in the property to persons not parties to the cause and that she therefore had no longer any interest in the building and therefore no basis for maintaining the action. But the Court held the case moot for each of the two reasons independently.

An affirmance would ostensibly require something to be done which had already taken place. A reversal would ostensibly avoid an event which had already passed beyond recall. One would be as vain as the other. To adjudicate a cause which no longer exists is a proceeding which this Court uniformly has declined to entertain." 261 U.S. at pages 217–218, 43 S.Ct. 263. In addition to cases which have been mentioned above in this opinion, the Court cited: Heitmuller v. Stokes, 256 U.S. 359, 41 S.Ct. 522, 65 L.Ed. 990 (1921); Commercial Cable Co. v. Burleson, 250 U.S. 360, 39 S.Ct. 512, 63 L.Ed. 1030 (1919); Public Utility Commissioners v. Compania General, 249 U.S. 425, 39 S.Ct. 332, 63 L.Ed. 687 (1919); Berry v. Davis, 242 U.S. 468, 470, 37 S.Ct. 208, 61 L.Ed. 441 (1917); American Book Co. v. Kansas, 193 U.S. 49, 24 S.Ct. 394, 48 L.Ed. 613 (1904); Codlin v. Kohlhausen, 181 U.S. 151, 21 S.Ct. 584, 45 L.Ed. 793 (1901); Singer Manufacturing Co. v. Wright, 141 U.S. 696, 12 S.Ct. 103, 35 L.Ed. 906, (1891); Little v. Bowers, 134 U.S. 547, 557, 10 S.Ct. 620, 33 L.Ed. 1016 (1890). In the Brownlow case the writ of error in the Supreme Court of the United States was to the judgment of the Court of Appeals directing issuance of the writ of mandamus by the Supreme Court of the District of Columbia, whereas in the instant case the appeal is not from the temporary restraining order itself but from the judgment that the Union was not guilty of civil contempt for failure, as charged, to comply with the restraining order. But if a review of a mandatory order becomes moot when the act ordered has been performed, as in the Brownlow case, a fortiori an appeal from a judgment of not guilty in a contempt proceeding instituted for the purpose of coercing obedience to a temporary restraining order becomes moot when the objectives of that order have eventuated, as in the instant case. In Gompers v. Bucks Stove & Range Co., supra, it was expressly held that the contempt proceeding necessarily ended with the settlement of the main cause of which it was a part.

If, in the instant case, we considered the appeal on the merits and reversed the judgment of not guilty of civil contempt and directed the District Court to coerce the Union into obeying the temporary restraining order, we would be doing and requiring a futile thing because the ultimate objectives of both the restraining order and of the civil contempt proceeding have, pending the appeal, eventuated; and if we affirmed we would be ruling in respect of events that have passed beyond recall.

The Government attempts to avoid the force of such reasoning and authorities as are set forth above not by denying their validity, but by asserting that the ambit of a civil contempt proceeding is sufficiently broad to include not only coercive measures to compel obedience to an order issued in a complainant's favor but also compensation to the complainant for loss or damage suffered by him from the contemnor's disobedience. The Government admits that "it is true that the cessation by the Union of the strike, subsequent to the adjudication by the district court of the Union's innocence of civil contempt, removed the need for any coercive sanctions to operate *in futuro*." But the Government urges that "the remedial sanctions relating to the compensation and reparation to be awarded to the United States for the Union's past disobedience of the temporary restraining order from February 11, 1950, through March 4, 1950, remain open and live issues . . . [which] can be disposed of only after this Court has determined the instant appeal from the district court's judgment dismissing the civil contempt proceeding." This dismissal deprived the Government, so we are told, "of the opportunity to demonstrate and obtain reparation for the loss . . . occasioned by the Union's conduct in contemning the temporary restraining order." The Government asserts that "The judgment from which this appeal is taken is . . . equivalent, in effect, to a judgment which finally dismisses an action to recover damages for tortious conduct (see Parker v. United States, 153 F.2d 66, 70); and the right to such damages obviously survives even where subsequent developments in respect of the principal suit—in which an injunc-

tion was properly issued—render unnecessary any *future* continuation of the injunction. Cf. Rice & Adams Corporation v. Lathrop, 278 U.S. 509; Hohorst v. Howard, 37 F. 97; Miller v. Edison Electric Illuminating Co., 66 App.Div. 470, 472, 73 N.Y. Supp. 376, 377, sustained as to the point here involved in 184 N.Y. 17, 20, 76 N.E. 734, 735." In brief, the Government contends that although the instant case may be moot as to the coercive relief sought in the petition for the rule to show cause—the need of such relief having been obviated by the ending of the labor dispute, the return of the Union miners to work and the consequent dissipation of the national peril—the case is not moot as to compensatory relief allowable to the Government in the civil contempt proceeding; i. e., compensation for loss or damage occasioned the Government by the Union's charged failure to obey the temporary restraining order. In final bulwark of this position the Government urges that Gompers v. Bucks Stove & Range Co., supra, is distinguishable from the instant case because in the former the parties to the settlement were also the parties to the injunction suit and contempt proceeding, whereas in the instant case the Government, the party complainant in the injunction suit and the contempt proceeding, was not a party to the settlement—that having been effected by the Union and the Operators.

It is of course true as the Government asserts that the reach of a civil contempt proceeding is broad enough remedially to include not only measures to compel obedience to a court order, but also compensation for loss or damage sustained by the complainant through the contemnor's disobedience. As said by Mr. Chief Justice Vinson speaking for the Court in United States v. Mine Workers, 330 U.S. 258, 303, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947): "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. Gompers v. Bucks Stove & Range Co., supra, at 448, 449." But the application by the Government in the instant case of this well settled proposition is unsound and leads to unsupportable conclusions because of a false premise—the premise that in the civil contempt proceeding tried in the District Court there was, in addition to the issue as to coercive relief, an issue as to compensation for loss or damage occasioned the Government. There was no such issue. Hence no such issue remained "open and live"; hence, the dismissal of the civil contempt proceeding did not deprive the Government "of the opportunity to demonstrate and obtain reparation for the loss . . . occasioned by the Union's conduct in contemning the temporary restraining order"; hence there was no "judgment . . . equivalent . . . to a judgment which finally dismisses an action to recover damages for tortious conduct"; and hence no "right to such damages . . . survives." The petition for the rule to show cause charging failure to obey the temporary injunction contains no allegation of loss or damage suffered by the Government therefrom. Moreover, neither the appendixes to the briefs nor the full record, including the transcript of the contempt hearing, discloses any offer by the Government of evidence of loss or damage. There is in the preamble to the temporary restraining order a recital by the District Court that it appears "from the verified complaint, the affidavits annexed thereto and the verified report of the Board of Inquiry that immediate and irreparable injury, loss and damage would result to the United States . . . before notice could be served to adverse parties and a hearing had on the application . . . for a temporary restraining order." This was the usual recital of a trial court in justification of *ex parte* action, and the District Court's order following this recital was, as has been stated above, *ex parte*. But we find neither in the verified complaint, nor in the affidavits annexed thereto, nor in the report of the Board of Inquiry any reference to loss or damage to the Government. The District Court's recital was in this respect in error. Had the Government in the contempt hearing of-

fered evidence of loss or damage and had the District Court admitted this evidence, the absence in the petition for the rule to show cause of an allegation of loss or damage might not, in view of Rule 15 (b) of the Federal Rules of Civil Procedure, have been fatal because the District Court could, within its discretion, upon motion, have permitted amendment of the pleadings to conform to the evidence; indeed under that Rule had such evidence been offered and received and an issue of compensation for loss or damage not raised by the pleadings thus been tried, failure so to amend the pleadings would not have affected the result of the trial of such an issue. But in the absence of both allegation and proof—even of an offer of proof—of loss or damage, the Government cannot justly claim that the contempt proceeding was one for compensation as well as for coercive relief. The case the mootness of which is in question is the case which was tried and appealed, not some case which might have been tried and appealed. The case which was tried and appealed was a civil contempt proceeding the object of which was to coerce the Union into obeying the restraining order, and it was such a proceeding only. That case is moot.

The cases of Rice & Adams Corporation v. Lathrop, Hohorst v. Howard and Miller v. Edison Electric Illuminating Co., cited by the Government, lend no support to its contentions in the instant case in respect of the question of mootness. None of those cases involved a question of mootness. All three sought damages as well as an injunction. The Rice & Adams case was a suit in the District Court for the Western District of New York to enjoin infringement of a patent and for an accounting of profits alleged to have been realized by the infringer and for damages assertedly sustained by the patent owner. Since the patent was about to expire, infringement had ceased and the responsibility of the defendant was unquestioned, the trial court denied, on a discretionary basis, a motion for a preliminary injunction. But the court nevertheless, over the objection of the defendant, instead of transferring the case to the law docket, retained jurisdiction in equity for a disposition of the issues in respect of profits and damages. Hohorst v. Howard was again a suit in equity to enjoin infringement of a patent and to obtain an accounting of profits from past infringements. The question was whether or not upon the death of the defendant the suit might be revived against her executrix, who was not alleged to have infringed. The Circuit Court for the Eastern District of New York held that it could. Miller v. Edison Electric Illuminating Co. was a suit in the Supreme Court of New York by a building owner to enjoin the operation of an electric light plant alleged to have injured his building and for damages. The Supreme Court found that by the time of the trial the operation of the plant had been so modified that no injury was being worked to the plaintiff's property, and that it was improbable that the plant would be so used as to work injury in the future, and accordingly withheld injunctive relief. The court, nevertheless, since at the time the action was commenced the plaintiff was entitled to the equitable relief prayed for, retained jurisdiction for the determination of damages. The Court of Appeals of New York affirmed this action. These three cases stand merely for the proposition stated by the Supreme Court of the United States in Rice & Adams Corporation v. Lathrop that a court of equity once having properly acquired jurisdiction of a case for any purpose will ordinarily retain jurisdiction for all purposes, including the determination of legal rights that otherwise would fall within the exclusive authority of a court of law. But they do not parallel on the facts the instant case because in the latter the District Court did not, after declining to issue an injunction, retain jurisdiction for the determination of loss or damage. It could not have done so because, as above pointed out, no loss or damage was either alleged or proved in the contempt hearing. It is to be added that, even assuming the existence in the contempt proceeding of an issue of loss or damage to the Government, the contention of the Government that that issue could be disposed of only after this court determined the instant ap-

peal from the District Court's judgment dismissing the civil contempt proceeding is not supported by any citation of authority, has no support in any authority of which we are aware, is contrary to the only decision we have been able to find on the subject, Newcomb v. United States, 98 F.2d 25 (9th Cir.1938), and is contrary to established trial practice in United States Courts. That practice requires that a complainant suing for damages alleged to have resulted from a violation of law shall introduce at the trial evidence not only of the facts which as a matter of law, under the complainant's theory of the case, establish the defendant's liability, but also evidence of the loss or damage he claims to have suffered. The theory of the Government apparently is that it had a right to present its case in the District Court upon the issue of liability alone and that, if it received, an adverse decision upon that issue, it then had a right to appeal, and, in the event of a reversal on the merits, a right to a second trial on the issue of loss or damage. Other litigants are afforded no such opportunity to try their cases piecemeal even in the absence of a settlement of the controversy during the appeal, much less when such a settlement has been effected as in the instant case. The Government is entitled to the same procedural rights as are enjoyed by other litigants, but not to more.

The distinction urged by the Government as above set forth in respect of Gompers v. Bucks Stove & Range Co. is, we think, not material. It may be that if the Government had in the civil contempt proceeding pleaded and proved loss or damage suffered by it through the failure of the Union, as charged, to obey the temporary restraining order it might not have been bound, so far as a right to recover such compensation was concerned, by the settlement between the Union and the Operators. But upon this we are not obliged to rule and do not rule for the reason that the Government neither pleaded nor proved loss or damage, and therefore such a question is not before us. In the absence of an issue concerning loss or damage, the question which we have to decide is not whether the Government was bound by the settlement between the Union and the Operators of the labor dispute, but whether the civil contempt proceeding, to which the Government was a party—which the Government itself instituted to secure obedience to the temporary restraining order—became moot by the accomplishment, through the settlement, of the objectives of that order. We hold that the civil contempt proceeding did become moot.

The Government argues further in its brief, on the question of mootness, that "The same considerations that impart finality, for the purposes of the statutory jurisdiction of an appellate court (supra, pp. 2–4), destroy appellee's contention that the case has been rendered moot." For this the Government cites Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932) and Lynham v. Hufty, 44 App.D.C. 589, 593 (1916). The parenthetical reference is to a contention earlier in the Government's brief that the judgment of not guilty of civil contempt is a final judgment which is independently appealable. We are unable to see what bearing either this argument or the cases cited have upon the question of mootness. That question is not whether or not an appeal can be taken from a judgment of not guilty of civil contempt independently of an appeal in the basic injunction proceeding itself of which the temporary restraining order and the contempt proceeding were incidents. The question is whether or not such an appeal, if it can be independently taken, is rendered moot by the eventuation of the objectives sought in the temporary restraining order to secure obedience to which the civil contempt proceeding was instituted.

It was suggested by the Government during the oral argument of the appeal that in the event of a reversal on the merits the Government might be awarded costs and that this saves the case from mootness. No authorities were cited to this effect, and we are aware of none. Such authorities as we find are to the contrary. Bender v. Donoghue, 70 F.2d 723 (5th Cir. 1934) and Clark v. Fairbanks, 249 Fed. 431 (5th Cir.1918). If the suggestion of the Government were correct, no case on appeal would ever be moot because in all

cases on appeal there is a possibility of an award of costs to the appellant in the event of a reversal. The Government's suggestion would abolish the doctrine that the settlement of a controversy pending appeal renders the appeal moot.

We have given consideration to the classes of cases typified by Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L. Ed. 310 (1911); Gay Union Corporation v. Wallace, 71 App.D.C. 382, 112 F.2d 192 (1940); and Boise City Irr. & Land Co. v. Clark, 131 Fed. 415 (9th Cir.1904), in which, against a contention that they were moot, orders which had expired or become inoperative were reviewed. In the Southern Pacific Terminal case, the order required the appellants to cease and desist for a period of not less than two years from granting undue preferences and advantages to a shipper in respect of wharfage charges and wharfage space. The two-year period had expired pending the appeal. The Supreme Court nevertheless held that it would review the order for the reasons that it might be the basis of further proceedings, and was of continuing character and capable of repetition and that such orders should not, because short term, evade review. In Gay Union v. Wallace, a cane sugar allotment order issued by the Secretary of Agriculture under the Sugar Act of 1937, 7 U.S.C.A. § 1111 et seq.—which required him to make annual determinations of sugar quotas and to apportion them among given areas and to make individual allotments of the area quotas—had become inoperative pending the appeal. This court nevertheless reviewed it because the Sugar Act was still in effect and as the court said: " . . . it seems not unlikely that the order complained of may be replaced by another of substantially similar import and that appellants, in the current year, will find themselves in the same position as in the preceding year, since, in the very nature of things, it will be again impossible to se-

cure a court review and obtain a decision before the end of the allotment period." [11] In the Boise City case, an order of a board of county commissioners, acting as a board of water commissioners, which prescribed maximum irrigation rates chargeable to consumers by an irrigation company for the irrigation season of a given year was reviewed notwithstanding the expiration of the year. The Court of Appeals decided the case "partly because the rate, once fixed, continues in force until changed as provided by law, and partly because of the necessity or propriety of deciding some question of law presented which might serve to guide the municipal body when again called upon to act in the matter." The underlying theory of these three decisions appears to be that a reviewing tribunal may properly establish a guide for an administrative body or official in respect of orders which may be the basis of further proceedings or are of continuing character or may be repeated, but which, because short term, may evade review. Even assuming some similarity between the temporary restraining order in the instant case and the orders reviewed in the three cases stated, there is obviously no similarity between them and the judgment of not guilty of civil contempt which is the subject of the appeal in the instant case. Certainly that judgment has no similarity to an irrigation rate order, or to a sugar allotment order, or to an order forbidding an illegal preference to a shipper.

*The appeal is dismissed as moot.*

FAHY, *Circuit Judge, dissenting.* As the very thoughtful opinion of Chief Judge STEPHENS demonstrates, and as I understand the Government does not dispute, the question of coercive relief in the civil contempt proceeding[1] has become moot by the settlement of the strike and the return of the miners to work. But the main question of contempt itself is not thereby rendered moot because other relief, in the form of compensatory damages, is sought

---

11. Compare Spreckels Sugar Co. v. Wickard, supra, in which we distinguish the Gay Union case.

1. Insofar as the proceedings involved alleged criminal contempt they are not before us on this appeal.

as a consequence of the alleged contempt. The able opinion of the court treats the contempt proceedings as if they were for coercive relief alone because the pleadings and evidence in those proceedings do not refer to compensatory damages, from which the court concludes there was no issue in that regard. As I appraise the course of events in the District Court the procedure followed was first to determine the issue of contempt, the question of relief or remedy to be considered subsequently should the contempt issue be resolved against the Union. Thus, the rule to show cause did not refer to the type of relief which might be granted. It directed the Union to show cause "why it should not be punished as and for civil and criminal contempt," without specification either of coercive or compensatory relief incident to the alleged civil contempt. It further provided that in event, by the time the return to the rule to show cause was made, it should be found that the alleged contempt had not sufficiently been purged, a trial should be held, again without specification in the order to this effect of the kind of relief or remedy the court might adopt if the trial resulted in finding that contempt had been committed. This was a reasonable mode of proceeding, though perhaps not the only mode.

The petition of the United States upon the basis of which the court issued the rule to show cause upon the Union includes a prayer for general relief. This furnishes an adequate basis for the admission of evidence as to the appropriate remedy should contempt be found to have occurred. Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 449, 31 S.Ct. 492, 55 L.Ed. 797. It was not essential that such evidence be adduced prior to determination of the basic issue of contempt. Accordingly, as it seems to me, that issue of contempt remains, unless we should hold as a matter of law that compensatory damages are not available to the United States.[2]

A majority of the court do not reach the merits of the questions of contempt or of compensatory damages, so I express no opinion as to them. Since in my view, because of those questions, the case is not moot, I think they should be considered and decided by the court.

2. Such damages were held available in the circumstances presented in United States v. United Mine Workers of America, 330 U.S. 258, 302, 303–304, 67 S. Ct. 677, 91 L.Ed. 884, where the United States had taken possession of the mines, a situation not present in the instant case. Here the United States is proceeding under the provisions of the Labor Management Relations Act of 1947 and not in a possessory or proprietary capacity.